**Casey BETTENCOURT, Appellant–Respondent,**

v.

**Chad C. FORD, Appellee–Petitioner.**

**No. 02A03–0404–CV–196.**

Court of Appeals of Indiana.

Jan. 14, 2005.

Publication Ordered Feb. 22, 2005.

Kendra Gowdy Gjerdingen, Mallor Clendening Grodner & Bohrer, Bloomington, IN, Attorney for Appellant.

Timothy M. Pape, Larry L. Barnard, Carson Boxberger, Fort Wayne, IN, Attorneys for Appellee.

## OPINION

SHARPNACK, Judge.

Casey (Ford) Bettencourt ("Mother") appeals the trial court's order modifying

child custody and awarding Chad Ford ("Father") custody of their son, Z.F. Mother raises one issue, which we restate as whether the trial court abused its discretion by granting Father's motion to modify custody. We affirm.

The relevant facts follow. Mother and Father were married and had one son, Z.F., who was born on May 25, 1997. Mother and Father divorced in March 2000. While Mother and Father's divorce was pending, Mother had expressed a desire to move to Florida with Z.F., but Father objected. Pursuant to their divorce decree, Mother and Father shared joint legal custody, and they shared physical custody of Z.F. on an alternate, two-week schedule.

On June 16, 2000, Mother filed a notice of intent to move, indicating that she was going to move Z.F. to Florida on the following day, June 17, 2000. Also on June 16, 2000, Father received a certified letter from Mother regarding her move to Florida with Z.F. That same day, Father went to Mother's house and saw that she had already moved.

Mother moved to Florida without prearranged employment or permanent housing. When Mother and Z.F. moved to Florida, they lived with Mother's father and stepmother and slept in their living room. While Mother and Z.F. lived in Florida, they changed residences five to six times, and several of those were residences where Z.F. did not have a bedroom or had to share a room with Mother. Mother also held various jobs while she and Z.F. lived in Florida. One of Mother's jobs, at which she worked for over one year, required her to work the 11:00 p.m. to 7:00 a.m. shift, during which time, Z.F. would stay with relatives and attend daycare during the day while Mother slept. While Mother lived in Florida, she was arrested for driving with a suspended driver's license and

violation of probation. This violation required Mother to serve thirteen days in jail, which she served on weekends over several months.

Immediately after Mother moved to Florida with Z.F., Father called Mother and objected to the move. Between the time Mother moved to Florida with Z.F. in June 2000 and 2003, Father attempted several times to have contact and visit with Z.F., but Mother refused. Father also lost contact with Mother due to her repeated change of residences.

After Mother moved to Florida with Z.F., Father got remarried, had two children, and is buying a house. Father works as a field paramedic, and he and his current wife arrange their work schedules so that one of them can be with the children.

In April 2003, Father filed a motion requesting: (1) a temporary restraining order and permanent injunction; (2) a finding of contempt against Mother for violating the divorce decree; (3) enforcement of his custody periods; and (4) a hearing to determine whether custody of Z.F. should be transferred to Father. On June 5, 2003, the trial court held a hearing on Father's motion for a temporary restraining order, contempt finding, and enforcement of his custody periods. Mother did not appear for the hearing, but the trial court found that Father had shown proof of service upon Mother. The trial court found Mother to be in contempt for failing to permit court-ordered contact and parenting time between Father and Z.F. The trial court granted Father's request for a temporary restraining order and enjoined Mother from interfering with his summer extended parenting time and from interfering with his attempts to contact Z.F.

On November 12, 2003, Mother filed a motion for relief from judgment. On November 12, 2003 and December 31, 2003, the trial court held hearings on Mother's motion and on Father's motion to modify custody.[1] The trial court entered an order, denying Mother's motion for relief from judgment and awarding custody of Z.F. to Father. Specifically, the trial court's order provided:

### FINDINGS OF FACT

1. This Court dissolved the marriage of [Father] and [Mother] on March 1, 2000. Pursuant to their agreement, the parties were granted joint legal custody of their only minor child, [Z.F.]. [Z.F.] was born May 25, 1997, was nearly three (3) years old at the time the Decree of Dissolution was entered, and is presently age six (6).

2. Also pursuant to their agreement and the Decree, the parties shared physical custody periods of [Z.F.] on an alternate, two week schedule that provided each parent with approximately 50% of the time with [Z.F.].

3. The Court's record reveals that on June 16, 2000, Mother filed her Notice of Intent to Move with [Z.F.] to Port Charlotte, Florida, and that she would be moving the next day, June 17, 2000.

4. On April 14, 2003, Father filed his Verified Application for Temporary Restraining Order and Permanent Injunction; Verified Motion for Contempt, Enforcement of Physical Custody Periods, and Request for Hearing. In this filing, Father sought permanent custody of [Z.F.].

5. Said Motion for Temporary Restraining Order was heard and granted on June 5, 2003, at which time Father appeared with counsel, and Mother failed to appear. The June 5, 2003 Order found Mother had been served notice of the proceeding, and enjoined Mother from interfering with Father's 2003 summer parenting time. Said Order also established specific summer parenting time for 2003. The Court further found Mother in contempt for failing to permit Father contact and physical custody periods with [Z.F.].

6. On November 12, 2003, Mother filed her Verified Motion for Relief from Judgment on the ground that she "was without actual knowledge" of Father's Verified Motions.

7. Both parties enjoyed equal contact and physical custody periods with [Z.F.] from the date of their separation in October, 1999, until Mother unilaterally moved [Z.F.] to Florida in June 2000.

8. Father was an attentive parent to [Z.F.] until Mother's move to Florida, and was at least a co-equal primary care provider for [Z.F.] during the marriage.

9. Mother was fired from her position as Patient Registrar at Lutheran Hospital in May 2000, for breaking work rules.

10. Father received a Certified Mail green card and retrieved the related registered letter on Friday, June 16, 2000. The hand-written letter from Mother informed Father of her move [to Florida]. Fa-

---

1. The hearings were not recorded; therefore, Mother prepared a "verified statement of the evidence from the best available sources" pursuant to Ind. Appellate Rule 31.

ther immediately went to Mother's residence, and found that no one was home, the drapes had been removed, and everything was gone.

11. Mother's Notice of Intent to Move states she would be moving on Saturday, June 17. However, Father testified that Mother was moved out by the time Father went to her home on Friday, June 16.

12. Mother intentionally provided Father minimal advanced notice of her moving [Z.F.] to Florida. This was in spite of the facts that the parties were [Z.F.'s] joint legal custodians, and that the parties equally shared the child's physical custody.

13. During the divorce, Mother had raised the issue of moving to Florida with [Z.F.], and Father had successfully resisted the child's move, resulting in the settlement and Decree, entered as this Court's Order just three months before Mother's move to Florida.

14. Upon discovering that Mother had moved with [Z.F.] on Friday, June 16, 2000, Father immediately tried to find them.

15. Both parties were experiencing difficult financial times in June of 2000. Father was bankrupt, and Mother was unemployed. Father could not afford to hire counsel to resist Mother's move at the time. Mother's move to Florida allowed her to be near relatives.

16. Father attempted to make his own arrangement to see [Z.F.], and asked Mother to return [Z.F.] to him. She refused. Father also asked to be able to visit with [Z.F.], but Mother refused.

17. Between June 2000, and early 2003, Father attempted several times to have contact with, and be able to visit with [Z.F.], which attempts were thwarted by Mother. At times, Mother flatly refused to permit contact, and at several other times, Father lost contact with Mother due to her frequent moving.

18. From the time Mother moved from the marital residence in October 1999, until the trial of this cause commenced in November 2003, she had nine different residences, averaging one move every six months.

19. When Mother moved to Florida in June 2000, she had no employment or permanent housing pre-arranged for her there. Mother first moved in with her father Ken Bettencourt, and his wife Diane upon arrival in Florida.

20. Ken and Diane Bettencourt's [sic] lived in a two bedroom house with Diane's seventeen (17) year old daughter, Tara, who then became pregnant. Mother and [Z.F.] had no bedrooms of their own, and slept in the living room.

21. Mother moved with [Z.F.] four more times after her move to Florida.

22. From the time of the filing of the dissolution petition through the time of trial, Mother has experienced employment difficulties, and has been employed at no fewer than nine different places of employment.

23. From January, 2001, until August 2002, Mother worked an 11:00 p.m. until 7:00 a.m. shift, during which time, [Z.F.] spent his nights at the homes of relatives, and attended daycare during the day, while Mother slept.

24. From August 2002, until the trial, Mother worked at Fawcett Memorial Hospital. She earned $9.47 per hour, plus some overtime pay. Mother's gross average weekly income from this employment was $520 per week.

25. Mother could likely find employment in Indiana at comparable rate of pay.

26. Mother testified that if this Court granted Father custody of [Z.F.], she would move back to Fort Wayne. She testified that her training and certification makes her employable anywhere in the United States, including northeast Indiana.

27. Mother reported she obtained new employment at a medical office during the course of the trial. She stated she will earn $8.50 per hour at this position, did not know any information about possible insurance for [Z.F.] through the new employer, and did not adequately explain why she would take such a substantial cut in pay.

28. While in Florida, Mother was arrested for driving with a suspended driver's license, and later for violation of probation. This violation required Mother to serve 13 days in jail, on weekends, over several months.

29. During the parties' marriage, while [Z.F.] was an infant, the parties lived for six (6) months with the child's paternal grandmother, Randi Ginder and her husband Duane Ginder. Ms. Ginder watched [Z.F.] while the parties were working. Ms. Ginder testified that during this period, Mother was lethargic, frequently slept late, and left [Z.F.] unattended, hungry, with a dirty diaper and in soiled clothes.

30. Since the divorce of the parties, Father has remarried and is purchasing his current home in Cromwell, Indiana. Father had had only one other residence since the divorce.

31. Father has likewise had more employment stability than Mother. At the time of trial he earned $16.34 per hour, and had gross average weekly income of $774 per week, currently in the position of field paramedic. He was a member of the Indiana Army National Guard from 1998 through 2002, and before that was a member of the U.S. Army.

32. Father has provided medical coverage for [Z.F.] since the parties separated. Father pays $19 per week for health care insurance for [Z.F.].

33. Father and his present wife, Lucy Ford, have a three year old son [K.F.] and an infant daughter [C.F.]. The Ford's [sic] typically arrange their work schedules so that while one is working, the other can be with the children. Their combined annual income is approximately $70,000.

34. Mother has sought relief from this Court's Order of June 5, 2003, which found her in contempt for violating Father's physical custody periods.

35. Mother claims that she was without actual knowledge of Father's Verified Motion for a Temporary Restraining Order, Permanent Injunction and Contempt, and she asserts that she did not receive notice of the June 5, 2003 hearing.

36. Father served his Verified Motion and Notice of Hearing upon Mother by numerous means. Father sent Mother relevant pleadings by

Certified Mail, but she failed to claim it. Additionally, Father sent pleadings to Mother by U.S. Mail. The Sheriff in Mother's Florida county served the papers upon Mother at her residence, which, at that time was 207 Cross Street, Apartment 123, Punta Gorda, Florida. The Florida Sheriff attempted personal service upon Mother on May 21, 22, 27, 28, 29, 31 and June 2, 2003. The Sheriff documented multiple attempts on many days. On June 2, the Sheriff left the pleadings on the door at 9 a.m., and the Sheriff reported that those papers were gone by 5:40 p.m. on that day. The Court's record also reveals that the Clerk mailed the Notice of Hearing to Mother at her Florida residence in Apartment 123, at 207 Cross Street, in Punta Gorda, Florida.

37. Mother confirmed in her testimony that she in fact did live in Apartment 123 at 207 Cross Street, in Punta Gorda, Florida, at the time all such service was made upon her. Mother likewise admitted she received letters and gifts from the child's paternal grandparents at that same address.

## CONCLUSIONS OF LAW

38. Prior to the Mother's move to Florida, the parties shared physical custody of [Z.F.] on an equal time basis. The parties thus then shared, not only joint legal custody but also joint physical custody of [Z.F.] prior to said move. Thus, Mother's move to Florida was effectively a unilateral attempt to modify the Court's custody Order, and her move denied [Z.F.] one of his primary caretakers, without input from that caretaker and joint legal custodian.

39. Mother moved to Florida without a job and without a proper residence for [Z.F.]. Mother has demonstrated instability in employment and in living arrangements since moving to Florida. She has had six different residences since moving to Florida, and had three different residences in the eight months before she moved there. She lived in multiple residences where she and [Z.F.] did not have a bedroom, or had to share a room.

40. Mother's life has been one of instability and impermanence, and thus, since at least the time of the move to Florida, so has been [Z.F.]'s life. Mother took [Z.F.] away from a more stable life in Fort Wayne, Indiana, and Mother moved [Z.F.] across the country to a place where he has been subjected to significant transience and uncertainty. Mother's move to Florida was in disregard for the relationship between Father and child. This move was, at best motivated by Mother's interest in being near her relatives who lived in Florida, and, at worst, was motivated by her desire to alienate Father and child.

41. In contrast, Father has led a much more stable life in northeastern Indiana. He has re-married, and now has two children with his present wife. Father lives with his new family in a comfortable home.

42. Mother's move to Florida deprived [Z.F.] of significant contacts he developed in his young life in the Fort Wayne area, including a healthy and loving relationship with his paternal grandparents.

43. Mother's move to Florida has substantially negatively impacted [Z.F.]'s relationship with Father. Father and child had a close, involved relationship prior to the move.

44. There is little evidence to suggest that Mother will support a healthy Father-child relationship if Mother were to remain the custodial parent.

45. There is also little evidence that Mother will provide [Z.F.] a permanent and stable environment. Since the Decree, Mother's employment, personal relationships, and living arrangements have been significantly less than stable.

46. Mother's move to Florida with [Z.F.] has not been in [Z.F.]'s best interests.

47. There has been a substantial change in one or more of the factors which the Court may consider under I.C. 31–17–2–8.

48. There has been a substantial change in the parties' circumstances concerning their interaction and interrelating with [Z.F.]. [Z.F.] has been denied a relationship with his Father as a result of Mother's move, which has been compounded by Mother's refusal to allow Father to have significant parenting time with [Z.F.].

49. There has been a substantial change in [Z.F.]'s relationships as he has been denied contact and a personal relationship with his grandparents, Randi and Duane Ginder, with whom [Z.F.] lived as an infant.

50. There has been a substantial change in [Z.F.]'s living circumstances. He is a six-year-old who in the last three years has had nine different residences, sharing several with many of Mother's roommates.

51. Father offers [Z.F.] economic and residential stability, which have not been provided by Mother in Florida.

52. Father's failure to take more immediate legal action to obtain custody of [Z.F.] is troubling for the Court. However, after considering the substantial factors impacting [Z.F.]'s best interests, as detailed above, the period of time Father legally tolerated the child's move is not a controlling factor for the Court.

53. It is in [Z.F.]'s best interest that custody be modified, and that Father be granted sole custody of [Z.F.].

54. There has been demonstrated a substantial and continuing change in circumstances that make the previously entered child support Order unreasonable.

55. If Mother moves back to northeastern Indiana, she shall exercise 98 annual overnights with the minor child. Child support is computed herein upon her promise to move back to northeastern Indiana.

56. The Court's Child Support Obligation Worksheet attached hereto, and is incorporated herein.

57. The notice to Mother of the June 5, 2003 hearing herein was reasonable under the circumstances.

58. The Court finds no factual or legal basis to grant Mother's "Verified Motion for Relief from Judgment."

\* \* \* \* \*

Appellant's Appendix at 16–22. Thereafter, Mother filed a petition to stay enforce-

ment of the custody order, which the trial court denied.

■■■ The sole issue is whether the trial court abused its discretion by granting Father's motion to modify custody. The modification of a custody order lies within the sound discretion of the trial court. *Spencer v. Spencer*, 684 N.E.2d 500, 501 (Ind.Ct.App.1997), *reh'g denied.* "We review custody modifications for abuse of discretion, with a 'preference for granting latitude and deference to our trial judges in family law matters.'" *Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind.2002) (quoting *In re Marriage of Richardson*, 622 N.E.2d 178, 178 (Ind.1993)). Our supreme court explained the reason for this deference in *Kirk*:

> While we are not able to say the trial judge could not have found otherwise than he did upon the evidence introduced below, this Court as a court of review has heretofore held by a long line of decisions that we are in a poor position to look at a cold transcript of the record, and conclude that the trial judge, who saw the witnesses, observed their demeanor, and scrutinized their testimony as it came from the witness stand, did not properly understand the significance of the evidence, or that he should have found its preponderance or the inferences therefrom to be different from what he did.

*Id.* (citing *Brickley v. Brickley*, 247 Ind. 201, 204, 210 N.E.2d 850, 852 (1965)).

"Therefore, '[o]n appeal it is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by appellant before there is a basis for reversal.'" *Id.* (quoting *Brickley*, 247 Ind. at 204, 210 N.E.2d at 852).

The trial court entered findings of fact and conclusions thereon when it issued its order modifying custody. When reviewing the trial court's findings of fact and conclusions thereon, we consider whether the evidence supports the findings and whether the findings support the judgment. *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997). Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference. *Id.* A judgment is clearly erroneous if it applies the wrong legal standard to properly found facts. *Id.* In order to determine that a finding or conclusion is clearly erroneous, our review of the evidence must leave us with the firm conviction that a mistake has been made. *Id.*

■■■ Here, after Mother filed her intent to relocate to Florida and after Father petitioned for a modification of custody, the trial court modified the child custody order and awarded custody of Z.F. to Father. When a custodial parent intends to relocate out of state, he or she is required to file notice of his or her intention to do so with the trial court. Ind.Code § 31–17–2–23(a) (Supp.2003).[2] The purpose of this

---

**2.** Ind.Code § 31–17–2–23 (Supp.2003) provides:

(a) If an individual who has been awarded custody of a child under this chapter intends to move to a residence:

    (1) other than a residence specified in the custody order; and

    (2) that is outside Indiana or at least one hundred (100) miles from the individual's county of residence;

the individual must file a notice of the intent to move with the clerk of the court that issued the custody order and send a copy of the notice to a parent who was not awarded custody and who has been granted visitation rights under IC 31–17–4 (or IC 31–1–11.5–24 before its repeal).

(b) Upon request of either party, the court shall set the matter for a hearing for the purposes of reviewing and modifying, if appropriate, the custody, visitation, and support orders. The court shall take into account the following in determining whether

notice requirement is to afford the trial court an opportunity to modify the original custody order, if necessary. *Fields v. Fields*, 749 N.E.2d 100, 109 (Ind.Ct.App. 2001), *trans. denied.* The notice of intent to relocate statute, Ind.Code § 31–17–2–23, must be construed in conjunction with the child custody modification statute, Ind. Code § 31–17–2–21. *Id.*

[6, 7] Ind.Code § 31–17–2–21(a) (Supp. 2003) governs the modification of a child custody order and provides, in part, that "[t]he court may not modify a child custody order unless: (1) the modification is in the best interests of the child; and (2) there is a substantial change in one (1) or more of the factors that the court may consider under [Ind.Code § 31–17–2–8]...." When making a determination to modify a child custody order, "the court shall consider the factors listed under [Ind. Code § 31–17–2–8]." Ind.Code § 31–17–2–21(b). Ind.Code § 31–17–2–8 (Supp. 2003) provides:

> The court shall determine custody and enter a custody order in accordance with the best interests of the child. In determining the best interests of the child, there is no presumption favoring either parent. The court shall consider all relevant factors, including the following:
>
> (1) The age and sex of the child.
>
> (2) The wishes of the child's parent or parents.
>
> (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
>
> (4) The interaction and interrelationship of the child with:

> (A) the child's parent or parents;
>
> (B) the child's sibling; and
>
> (C) any other person who may significantly affect the child's best interests.
>
> (5) The child's adjustment to the child's:
>
> (A) home;
>
> (B) school; and
>
> (C) community.
>
> (6) The mental and physical health of all individuals involved.
>
> (7) Evidence of a pattern of domestic or family violence by either parent.
>
> (8) Evidence that the child has been cared for by a de facto custodian, and if the evidence is sufficient, the court shall consider the factors described in section 8.5(b) of this chapter.

"In summary, all that is required to support modification of custody under I.C. § 31–17–2–21 is a finding that a change would be in the child's best interests, a consideration of the factors listed in I.C. § 31–17–2–8, and a finding that there has been a substantial change in one of those factors." *Nienaber v. Nienaber*, 787 N.E.2d 450, 456 (Ind.Ct.App.2003). Although both parents are presumed equally entitled to custody in the initial custody determination, a petitioner seeking subsequent modification bears the burden of demonstrating the existing custody order should be altered. *Kirk*, 770 N.E.2d at 307.

Mother argues that the trial court abused its discretion by changing physical custody of Z.F. from Mother to Father because the trial court failed to focus upon Z.F.'s welfare in making its determination and because Z.F.'s interests were not prejudiced by the move to Florida.[3] Father argues that the trial court did not abuse its

---

to modify the custody, visitation, and support orders:
(1) The distance involved in the proposed change of residence.

(2) The hardship and expense involved for noncustodial parents to exercise visitation rights....

**3.** Mother cites to *Fridley v. Fridley,* 748 N.E.2d 939, 941 (Ind.Ct.App.2001) to support

discretion by modifying custody because there was evidence to support the trial court's determination that modification was in Z.F.'s best interests and that there was a substantial change in at least one of the factors listed in I.C. § 31–17–2–8. We agree with Father.[4]

In determining that the custody order should be modified, the trial court focused on the substantial change in the interaction and interrelationship of Z.F. with Father and with his paternal grandparents and the best interests of Z.F. to have a stable environment. As the trial court's order and the record reflect, prior to June 2000, Mother and Father had joint legal custody of Z.F. and shared physical custody of him as well. Mother gave Father a one-day notice that she was relocating with Z.F. to Florida, where she did not have a job or a permanent residence. Once in Florida, Mother initially had difficulties securing a job, and she and Z.F. changed residences multiple times. For a period of over one year, Mother worked the night shift in a job, which required that Z.F. stay with relatives during the night and go to daycare during the day while Mother slept. While in Florida, Mother was arrested and had to spend several weekends in jail. After Mother moved Z.F. to Florida, Father attempted several times to contact and see Z.F., but either Mother refused or Father lost contact with her due to her repeated moves. Since the divorce, Father has remarried, has two kids, and works as a field paramedic. Father and his current wife arrange their schedules so that one of them can be home with their children. Finally, Father's parents, with whom he, Mother, and Z.F. lived for a six-month period, have been unable to see Z.F. after he moved to Florida.

Mother argues that there was evidence that she had recently had some job and residence stability and that Z.F. was "do-

---

her argument that the trial court abused its discretion by modifying custody because it failed to find the move to Florida had prejudiced Z.F.'s interest. We have previously held in cases dealing with the notice of intent to relocate statute that "[t]he denial of continued custody, solely on the grounds of change in residence, is improper 'where the move is being made in good faith and out of a desire to improve the material or psychological life of the custodian, so long as the child's interests are not prejudiced thereby.'" *Swonder v. Swonder*, 642 N.E.2d 1376, 1380 (Ind.Ct.App. 1994) (quoting *Sebastian v. Sebastian*, 524 N.E.2d 29, 33 (Ind.Ct.App.1988)). However, we have also held that the notice of intent to relocate statute, Ind.Code § 31–17–2–23, must be construed in conjunction with the child custody modification statute, Ind.Code § 31–17–2–21. *Fields v. Fields*, 749 N.E.2d 100, 109 (Ind.Ct.App.2001), *trans. denied.* Here, the trial court did not modify custody based solely on the grounds of change of residence. Instead, it applied the child custody modification statute and modified custody after it found that the modification was in Z.F.'s best interest and that there was a substantial change in one of the factors listed in Ind.Code § 31–17–2–8. Thus, we will review and analyze the trial court's modification of the child support order under the child custody modification statutes.

4. Mother also argues that the trial court disregarded Indiana Code § 31–17–2–21(c) by hearing evidence and making several findings as to matters that occurred prior to the last custody proceeding. Specifically, Mother contends that the trial court abused its discretion by hearing testimony regarding Mother's care of Z.F. prior to the last custody order and regarding her employment and residential moves prior to the last custody order. Ind.Code § 31–17–2–21(c) provides that "[t]he court shall not hear evidence on a matter occurring before the last custody proceeding between the parties unless the matter relates to a change in the factors relating to the best interests of the child as described by section 8 . . . ." Our review of the record, however, reveals that even without the complained of testimony, there is evidence of substantial change in one of the statutory factors since the original custody order. Therefore, we conclude that Mother's argument is without merit.

ing well, ... attended church regularly with his mother, [and] was involved in numerous activities, including soccer, basketball, swimming, and tae kwon do...." Appellant's Brief at 10. Mother's argument, however, is an invitation to reweigh the evidence and judge the credibility of the witnesses, which we cannot do. *See Haley v. Haley*, 771 N.E.2d 743, 747 (Ind. Ct.App.2002). The trial court saw Mother and Father as witnesses, observed their demeanor, and scrutinized their testimony as it came from the witness stand. As in *Kirk*, we are "in a poor position to look at a cold transcript of the record, and conclude that the trial judge, who saw the witnesses, observed their demeanor, and scrutinized their testimony as it came from the witness stand, did not properly understand the significance of the evidence, or that he should have found its preponderance or the inferences therefrom to be different from what he did." *Kirk*, 770 N.E.2d at 307. Based upon all of the evidence, we cannot say that the trial court abused its discretion by finding that a substantial change occurred in one of the statutory factors or that modification was in Z.F.'s best interests. Accordingly, we conclude that the trial court did not abuse its discretion by granting Father's motion to modify custody.[5] *See, e.g., Haley*, 771 N.E.2d at 750 (holding that the trial court did not err by modifying custody in favor of the father).

For the foregoing reasons, we affirm the trial court's order modifying custody and awarding custody of Z.F. to Father.

Affirmed.

BAKER, J., and FRIEDLANDER, J., concur.

### ORDER

On January 14, 2005, the Court handed down its opinion in this appeal marked Memorandum Decision, Not for Publication. The Appellee, by counsel, has filed a Motion to Publish Memorandum Decision. The Appellee states that this decision resolves a legal issue of unique interest and that its publication will likely serve the interest of judicial economy by serving as precedent. Having considered the matter, the Court FINDS AND ORDERS AS FOLLOWS:

The Appellee's Motion to Publish Memorandum Decision is GRANTED and this Court's opinion heretofore handed down in this cause on January 14, 2005, marked Memorandum Decision, Not for Publication is now ORDERED PUBLISHED.

All Panel Judges concur.

---

5. Mother also argues that the trial court modified the custody order merely to "punish" her for relocating to Florida without first seeking a modification of the existing custody order when she filed her notice of intent to move under Ind.Code § 31–17–2–23. Appellant's Brief at 11. We disagree.

When a custodial parent relocates out of state, that parent must file a notice of intent to change residence pursuant to Ind.Code § 31–17–2–23. The purpose of this notice is not to punish the custodial parent, but to provide the means for the trial court to modify the original custody and support orders, if

necessary. *Swonder v. Swonder*, 642 N.E.2d 1376, 1380 (Ind.Ct.App.1994). Our review of the trial court's order reveals no evidence that the trial court was trying to punish Mother when it modified the custody order. As shown above, the trial court construed the notice of intent statute with the child custody modification statute and found that modification of custody was in Z.F.'s best interests and that there was a substantial change in the interaction and interrelationship of Z.F. with Father and with his paternal grandparents. Therefore, we conclude that Mother's argument is without merit.