**In re: the PATERNITY OF Z.T.H.,**

**Stanley C. Ketner and Toni J. Ketner, Appellants/Cross–Petitioners,**

v.

**Daniel K. Horan, Appellee/Petitioner,**

**Sara A. Ketner, Respondent.**

No. 49A04–0504–JV–191.

Court of Appeals of Indiana.

Dec. 20, 2005.

Judith N. Stimson, Broyles Kight & Ricafort, LLP, Indianapolis, for Appellants.

Oliva A. Napariu, Emswiller Williams Noland & Clarke, P.C., Indianapolis, for Appellee.

## OPINION

BARNES, Judge.

### Case Summary [1]

Stanley and Toni Ketner appeal the trial court's granting of Daniel Horan's petition

---

1. We deny the Ketners' September 16, 2004 motion for oral argument and grant their motion to submit additional authority.

to modify custody. We reverse and remand.

### Issues

The Ketners raise five issues, which we consolidate and restate as:

I.      whether the parental presumption applies to a parent's request to modify a third party's custody; and

II.     whether the trial court properly granted Horan's petition to modify custody.

### Facts

On February 19, 1991, Horan and the Ketners' daughter, Sara,[2] had Z.T.H. In the late spring of 1993, the Ketners assumed custody of Z.T.H. In October 1994, Horan filed a petition to establish paternity, custody, visitation, and child support, and the Ketners cross-petitioned. On December 22, 1994, Horan, Sara, and the Ketners entered into an agreement that gave the Ketners' custody of Z.T.H., allowed Horan and Sara visitation, obligated the Ketners to maintain medical and dental insurance for Z.T.H., and required Horan and Sara to pay child support.

Until April 2003, Horan lived in Greene County, and Z.T.H. lived with the Ketners in Zionsville. During that time, Horan maintained regular telephone contact and visitation with Z.T.H. and attended Z.T.H.'s sporting events and school activities.

This arrangement continued without objection until April 16, 2003, when Horan moved to Zionsville and petitioned to modify custody because Z.T.H.'s physician and the Ketners placed him on medication for

---

attention deficit disorder without Horan's approval. After further evaluation, however, Horan agreed that such medication was proper, but he did not withdraw his petition to modify custody. Shortly after the petition was filed, the trial court directed Dr. Richard Lawlor to perform a full custody evaluation. Dr. Lawlor completed his evaluation on July 10, 2003, and completed an updated evaluation on May 7, 2004. Dr. Lawlor recommended that Z.T.H. remain in the Ketners' custody.

On August 30, 2004, after a hearing on the matter, the trial court entered extensive findings of fact and conclusions thereon granting Horan's petition and awarding him custody of Z.T.H. On September 29, 2004, the Ketners filed a motion to correct error, which the trial court denied after hearing arguments on the issues raised in the motion. The Ketners now appeal the granting of Horan's petition to modify custody.

### Analysis [3]

Horan requested findings of fact and conclusions thereon. In reviewing findings made pursuant to Indiana Trial Rule 52(A), we first determine whether the evidence supports the findings and then whether the findings support the judgment. *Borth v. Borth,* 806 N.E.2d 866, 869 (Ind.Ct.App.2004). On appeal, we may "not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A).

A judgment is clearly erroneous when there is no evidence supporting the find-

---

**2.**  Sara is not a participant in this custody dispute.

**3.**  Horan and the trial court used the terms burden of proof and standard of review interchangeably. The burden of proof, however, is "[a] party's duty to prove a disputed assertion

or charge." Black's Law Dictionary 190 (7th ed.1999). The standard of review, on the other hand, is more accurately described as the amount of deference an appellate court gives to the trial court's decision.

ings or the findings fail to support the judgment. *Fraley v. Minger*, 829 N.E.2d 476, 482 (Ind.2005). A judgment is also clearly erroneous when the trial court applies the wrong legal standard to properly found facts. *Id.* "While findings of fact are reviewed under the clearly erroneous standard, appellate courts do not defer to conclusions of law, which are reviewed de novo." *Id.* In cases where mixed issues of fact and law are presented we have described the standard of review as an abuse of discretion. *Id.* A finding or conclusion is clearly erroneous when a review of the evidence leaves us with the firm conviction that a mistake has been made. *Id.*

## I. Framework for Modification of Third Party Custody

The Ketners contend that the trial court improperly required them to rebut the presumption favoring custody with Horan, as Z.T.H.'s father, when it was Horan who was seeking to modify the custody arrangement that had been effect for almost ten years. They assert that Horan was instead required to show a substantial change in circumstances and that the modification of custody was in Z.T.H.'s best interests. Both parties and the trial court frame this issue as an either/or question—either the Ketners must rebut the parental presumption or Horan must establish that modification was proper.

The Ketners specifically argue that this case is unlike other third-party custody cases because they had been Z.T.H.'s permanent legal custodians for almost ten years pursuant to a custody agreement to which Horan was a party. The Ketners contend that because Horan was attempting to modify custody, the trial court improperly applied the parental presumption and should have instead required Horan to show that modification was proper under

Indiana Code Section 31–14–13–6, the child custody modification statute for paternity proceedings. The Ketners assert that Horan did not establish that modification was proper. Alternatively, the Ketners argue that even if a parental presumption applies to cases in which the child has been in the long-term permanent custody of a third party, the parental presumption is waived where the parent voluntarily relinquishes custody pursuant a written custody agreement.[4] The Ketners also contend that if the parental presumption applies and Horan has not waived it, they rebutted it with clear and convincing evidence.

We begin our analysis with *In re Guardianship of B.H.*, 770 N.E.2d 283, 285 (Ind. 2002), which involved an initial custody determination between a father and a stepfather, shortly after the death of the children's mother, who had previously been awarded custody of the children. The stepfather sought and obtained an emergency order appointing him temporary guardian of the children immediately after the children's mother died. *Id.* Only weeks after the stepfather was appointed guardian, the children's father petitioned to terminate the guardianship and the stepfather cross-petitioned for permanent guardianship. *Id.*

In upholding the trial court's award of custody to the stepfather, the *B.H.* court observed that there is a "strong and important presumption that the child's best interests are ordinarily served by placement in the custody of the natural parent." *Id.* at 287. The court recognized, "[t]his presumption does provide a measure of protection for the rights of the natural parent, but, more importantly, it embodies innumerable social, psychological, cultural, and biological considerations that signifi-

---

4. Although Horan may have knowingly relinquished custody of Z.T.H., we do not agree that he also knowingly or impliedly waived the parental presumption.

cantly benefit the child and serve the child's best interests." *Id.* The court held that "before *placing* a child in the custody of a person other than the natural parent, a trial court must be satisfied by clear and convincing evidence that the best interests of the child require such a placement." *Id.* (emphasis added).

The court emphasized that the issue was not merely the fault of the parent, but whether "the important and strong presumption that a child's interests are best served by placement with the natural parent is clearly and convincingly overcome by evidence proving that the child's best interests are substantially and significantly served by placement with another person." *Id.* Stated broadly, *B.H.* requires a third party to rebut the parental presumption by showing that it is not in the child's best interests to be placed with the parent and to show that it is the child's best interests to be placed with the third party.

In *In re Paternity of V.M.*, 790 N.E.2d 1005 (Ind.Ct.App.2003), a panel of this court applied the *B.H.* analysis to a case factually similar to the one before us today. In *V.M.*, a father who had relinquished custody of his children to their maternal grandfather several years earlier petitioned to modify custody shortly after the grandfather had moved for and received permanent guardianship of the children without objection from the father. *Id.* at 1006. Since the father had initially relinquished custody, he had gotten married, stopped drinking alcohol and using drugs, participated in consistent visitation, and paid child support.

Without addressing the applicability of *B.H.* to a custody dispute that did not involve the initial placement of a child outside of the parent's custody, we applied the *B.H.* analysis and "presumed that it was in the best interest of the children to be placed in the custody of their natural father." *Id.* at 1008. The grandparents had the burden to overcome that presumption, which they did. *Id.* We then affirmed the trial court's conclusion that remaining in the grandparents' custody was in the children's best interests. *Id.* at 1009.

Horan relies heavily on *V.M.* for the proposition that the Ketners had the burden to overcome the parental presumption. Because the trial court concluded that the Ketners did not meet this burden, Horan urges that we should affirm its granting of his petition. Although we do not necessarily disagree with the outcome of *V.M.*, we do believe, given the arguments before us today, that a closer look at *B.H.*'s application to these facts is necessary.

Most significantly, *B.H.* addressed the "placement" of a child with a third party. *B.H.*, 770 N.E.2d at 287 ("[W]e hold that, before *placing* a child in the custody of a person ·other than the natural parent, a trial court must be satisfied by clear and convincing evidence that the best interests of the child require such a *placement*." (emphases added)). Today we are not asked to address the placement of Z.T.H. with a person other than Horan because, pursuant to the custody agreement, Z.T.H. has been in the Ketners' custody for over a decade. We are instead asked to address the modification of that custody arrangement.

In deciding how to protect Z.T.H.'s best interests and Horan's parental rights in a modification proceeding involving third party custodians, we are guided by our earlier analysis in *In re Guardianship of L.L.*, 745 N.E.2d 222 (Ind.Ct.App.2001), *trans. denied.* Although decided before *B.H.*, it is instructive as to the applicability of the parental presumption after a child has been placed in the permanent custody of a third party and a parent subsequently seeks to modify custody.

In *L.L.*, we examined the parental presumption in terms of the best interests of the child, the protection of a parent's constitutional rights, and legislative acknowledgement of de facto custodians. *Id.* at 227–30. In addressing whether the then-recent legislative changes removed the presumption favoring the natural parent in a third party custody dispute, we concluded that they did not remove the parental presumption. *Id.* at 229–30. We held that a custody dispute between a parent and a third party should be resolved as follows:

> First, there is a presumption in all cases that the natural parent should have custody of his or her child. The third party bears the burden of overcoming this presumption by clear and cogent evidence.... If the presumption is rebutted, then the court engages in a general "best interests" analysis.

*Id.* at 230–31.

In applying this analysis to the facts in *L.L.*, we concluded that the grandmother did not rebut the parental presumption. *Id.* at 231–33. Accordingly, we did not reach the "general 'best interests'" analysis and reversed the trial court's denial of the mother's petition to terminate the grandmother's guardianship. *Id.* In doing so we observed:

> For the sake of children, society should encourage parents who are experiencing difficulties raising them to take advantage of an available "safety net," such as a grandparent who is willing to accept temporary custody of a child. It would discourage such action by parents in difficult straits and discourage efforts to "reform" or better their life situation if their chances of later reuniting with their children were reduced.

*Id.* at 233.

Although we are guided by the reasoning in *L.L.*, the facts in that case are also distinguishable from those before us today. *L.L.* involved a custody arrangement initiated when the children's parents were unable to care for them because of their "tumultuous" lifestyles involving substance abuse. *Id.* at 225. Here we are asked to address the long-term custody arrangement that Horan entered into because he was "young[5] and scared of having [Z.T.H.] in his care as a single parent." App. p. 9. Moreover, in *L.L.*, the mother made significant lifestyle changes over the years that the guardianship was litigated. During that time, she had remarried, obtained steady employment, and remained sober for approximately six years. *L.L.*, 745 N.E.2d at 226. Thus, the conditions that led to her initial relinquishment of custody had significantly improved. Unlike in *L.L.*, however, there is no indication that the circumstances leading to Horan relinquishing custody had significantly improved. Finally, less than a year after the guardianship was made permanent, the mother began attempting to terminate the guardianship. *Id.* at 232. Although she eventually regained custody of one of the boys, she unsuccessfully sought to terminate the grandmother's guardianship of the other boy four times in five years. *Id.* at 226, 232. In striking contrast, almost ten years passed before Horan first petitioned to modify custody. During that time, Horan maintained a relationship with Z.T.H. but made no effort to obtain custody of him.

Although *V.M.*, *B.H.*, and *L.L.* involve custody disputes between a parent and a third party, none of them addresses the proper analysis where a parent seeks to modify a long-term permanent third party custody arrangement and there has not been a significant change in circumstances

---

**5.** Horan was twenty-five years old when Z.T.H. was born.

that led to the parent initially relinquishing custody. However, we take from these cases that Indiana courts still recognize and strongly value the parental presumption. Today, we are also asked to reconcile the presumption that custody with the parent is in the child's best interest with the longstanding concept that "permanence and stability are considered best for the welfare and happiness of the child." *Lamb v. Wenning,* 600 N.E.2d 96, 98 (Ind. 1992).[6]

▉ In a proceeding to modify custody, the burden is on the petitioner. *See id.* In a paternity action:

> The court may not modify a child custody order unless:
>
> > (1) modification is in the best interests of the child; and
> >
> > (2) there is a substantial change in one (1) or more of the factors that the court may consider under section 2 and, if applicable, section 2.5 of this chapter.

Ind.Code § 31–14–13–6.[7]

We believe that these statutes were intended to apply to modification proceedings between a child's two parents, and we are not aware of any cases that apply this statute to a custody dispute between a parent and third party.[8] However, given that the high burden of proof in modification proceedings arises out of the presumption that permanence and stability are in the child's best interests and is not based on the interests or rights of the

parent seeking to modify custody, we see no reason why the application of this statute should be limited to custody disputes between parents.

Having recognized that the parental presumption and the stringent standards for modification are both important considerations in determining what custody arrangement is in the child's best interests, we merge these seemingly conflicting concepts when a parent seeks to modify a third party's custody. In addressing a parent's request to modify a third party's custody, we believe a burden shifting approach is the most appropriate way to protect parental rights and the best interests of the child.

▉ First, in keeping with *B.H.,* we conclude that when a parent seeks to modify the long-term permanent custody of a third party, the third party must rebut the parental presumption with "evidence establishing the natural parent's unfitness or acquiescence, or demonstrating that a strong emotional bond has formed between the child and the third party[.]" *B.H.,* 770 N.E.2d at 287. If the third party is able to rebut the parental presumption with clear and convincing evidence, the third party is essentially in the same position as any custodial parent objecting to the modification of custody. In other words, the third party and the parent are on a level playing field, and the parent seeking to modify custody must establish the statutory requirements for modification by showing

---

**6.** "Prior to July 1, 1994, a trial court could modify a custody arrangement 'only upon a showing of changed circumstances so substantial and continuing as to make the existing custody order unreasonable.' ' *Wallin v. Wallin,* 668 N.E.2d 259, 260 (Ind.Ct.App. 1996) (quoting *Lamb,* 600 N.E.2d at 98).

**7.** Generally a substantial change in circumstances cannot be premised on changes occurring during the period in which the custo-

dy of the child has been transferred. *Bryant v. Bryant,* 693 N.E.2d 976, 979 (Ind.Ct.App. 1998).

**8.** We note that Indiana Code Section 31–14–13–2.5 provides factors for the award of custody to a de facto custodian. However, it is not applicable here because the parties entered into the agreement in 1994 and the statute was not enacted until 1999.

that modification is in the child's best interests and that there has been a substantial change in one or more of the enumerated factors.

■ This two-step approach protects a parent's constitutional rights and the child's best interests. Contrary to the parties' arguments and the trial court's conclusions, we do not agree that an either/or approach sufficiently satisfies both goals. Thus, the trial court erroneously concluded that cases involving an initial custody placement with a third party and cases involving the modification of an existing third party custody arrangement are always subject to the same legal analysis. *See* App. p. 16.

## II. Application of the Facts to This Framework

■ Custody modifications are reviewed for an abuse of discretion, with a " 'preference for granting latitude and deference to our trial judges in family law matters.' " *Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002) (quoting *In re Marriage of Richardson*, 622 N.E.2d 178, 178 (Ind.1993)). "We set aside judgments only when they are clearly erroneous, and will not substitute our own judgment if any evidence or legitimate inferences support the trial court's judgment." *Id.* "In order to determine that a finding or conclusion is clearly erroneous, our review of the evidence must leave us with the firm conviction that a mistake has been made." *Bettencourt v. Ford*, 822 N.E.2d 989, 997 (Ind.Ct.App. 2005).

The Ketners do not challenge the findings as being unsupported by the evidence. Their challenge is to the application of the trial court's findings to the law and the resulting conclusions. In granting Horan's petition to modify custody, the trial court's order provided:

## FINDINGS OF FACT

\* \* \* \* \* \*

16. The Ketners assumed custody of [Z.T.H.] when Mother left [Z.T.H.] in their care in the late spring of 1993. At the time, Father was young and scared of having [Z.T.H.] in his care as a single parent. Father and the Ketners also wanted [Z.T.H.] to have medical insurance coverage available through the Ketners. Since that time, the Ketners have essentially been the sole caretakers and providers of [Z.T.H.].

17. Mother is recovering from heroin addiction. Her only contact with [Z.T.H.] has been with Father present and for short periods of times, such as having lunch or going shopping. Mother was not present at the May 11, 2004 hearing.

18. Throughout the Ketners' care and custody of [Z.T.H.], Father telephoned [Z.T.H.] regularly, attended the majority of [Z.T.H.]'s sporting events and school activities and consistently exercised visitation.

19. Throughout the Ketners' care and custody of [Z.T.H.], the Ketners and Father have gotten along reasonably well and have generally been able to resolve any issues regarding Father's visitation with [Z.T.H.].

20. Prior to filing his Verified Petition for Modification of Custody, Father resided in Greene County, Indiana for six (6) years.

21. Father's residence in Greene County is located on eight (8) acres of land purchased by Father's mother. The residence and land is not owned by Father, but by a trust created by his mother.

22. Father and his two (2) roommates built the residence in Greene County. Father's Mother paid for most of the

materials used in building the residence. The residence is not completely finished.

23. Father moved to Zionsville, Indiana, in April, 2003 with the intention of seeking custody of [Z.T.H.]. Prior to Father's relocation to Zionsville, the Ketners placed [Z.T.H.] on a trial of Strattera. Father was upset that [Z.T.H.] was placed on medication without his knowledge and Father questioned the appropriateness of [Z.T.H.]'s taking Strattera.

24. During Father's transition from Greene County to Zionsville, Indiana, Father's Mother provided Father Fourteen Thousand Five Hundred Dollars ($14,500.00) in funds which Father used for his expenses, including living expenses. Father's mother has also paid for gifts for Father to give to [Z.T.H.].

25. Father's residence in Zionsville is a two-bedroom apartment.

26. The Ketners also live in Zionsville and have lived in the same house for twenty-three years. Father's residence is in the same school district as the Ketners' residence.

27. Any change in custody would not necessitate [Z.T.H.] changing school systems, or being removed from any established relationships. Father is willing to remain in Zionsville until [Z.T.H.] completes high school so that [Z.T.H.] does not need to change schools. Father testified that he would only remove [Z.T.H.] from the Zionsville school system if it was in [Z.T.H.]'s educational best interests.

28. At the time Father moved to Zionsville, [Z.T.H.] regularly attend the Boys and Girls club. Since shortly after moving to Zionsville, Father has been conducting a studio production program at the Boys and Girls Club. Anywhere from ten to twenty-five children attend Father's program.

29. After father questioned [Z.T.H.]'s taking of Strattera, Father and the Ketners participated in a complete evaluation of [Z.T.H.] for attention deficit disorder by a pediatric psychiatrist.

30. Father was appropriate in his participation with the psychiatrist. As a result of the evaluation, [Z.T.H.] was placed on Strattera with the agreement of the Ketners and Father.

31. Father and the Ketners agree that [Z.T.H.]'s grades have significantly improved and [Z.T.H.]'s attitude has improved since [Z.T.H.] began taking Strattera.

32. Father graduated from Cathedral High School and is currently thirty-eight years old; he has never married and, other than Mother, has never had a long term relationship.

33. Father is a musician who has self taught himself music and sound production.

34. Father does not have an extensive work history. In tax year 2003, Father reported income of Five Thousand One Hundred Fifty–Two Dollars ($5,152.00). After moving from Greene County to Zionsville, Father was involved in the production of a musical CD. Father's production of the CD did not generate any income.

35. Father has been employed as a lighting director/sound technician at the Egyptian Room at the Murat Center in Indianapolis, Indiana since March of 2004. Father earns Fourteen Dollars ($14.00) per hour.

36. Father is working forty (40) hours per week in his position at the Egyptian Room. In addition, Father also works for RJS Productions as a stage hand when work is available and makes Sixteen Dollars ($16.00) per hour. Father

also works a couple times a month as a stage had at the Vogue night club.

37. Father's supervisor at the Egyptian Room, Andrew Mills, testified that Father is a knowledgeable, skilled and trusted employee. Further, Mr. Mills testified that Father's employment at the Egyptian Room is secure.

38. Father has not had aspirations to generate high income. Father testified that he had previously only worked enough to pay bills. Father is currently earning enough money to be capable of paying his expenses, including rent, utilities, food and clothing. Father's income is sufficient for Father to maintain a home for [Z.T.H.], including payment of utilities, food, and clothing, and any of [Z.T.H.]'s other expenses.

39. Father's mother is financially able and willing to assist Father if necessary to assure Father's continued ability to provide for [Z.T.H.].

40. Stanley C. Ketner is presently employed at Tubes, Incorporated, as a district sales manager earning $36,000.00 a year. He has held such employment for 1½ years.

41. Toni J. Ketner is an administrative assistant at St. Vincent New Hope. She has been employed at New Hope since 1980 and earns approximately $14.00 an hour. Mrs. Ketner carries health insurance for [Z.T.H.].

42. The Ketners oppose Father's request for custody because of Father's "carefree spirit," lack of "stability" and concern for Father's providing for [Z.T.H.]'s physical needs, such as clothing [Z.T.H.] wants and health insurance. However, the Ketners cannot substantiate their concerns and cannot point to anything about Father's behavior or lifestyle that would make an award of custody to father inappropriate.

43. Father has investigated obtaining medical insurance for [Z.T.H.]. Father is capable of obtaining and paying for medical insurance for [Z.T.H.]. Father is also capable of paying any non-covered or uninsured medical expense for [Z.T.H.].

44. Father does not abuse drugs or alcohol. No evidence has been presented that Father is in any way unfit to have [Z.T.H.]'s care and custody, and the Ketners do not believe Father is unfit.

45. Contrary to the Ketners' belief, Father did not encourage [Z.T.H.] to refuse to take his Strattera during [Z.T.H.]'s trial of the medication.

46. There is no evidence to believe that Father would make health and medically related decisions for [Z.T.H.] that are contrary to [Z.T.H.]'s best interests.

47. Contrary to the Ketners' belief, Father does want [Z.T.H.] to attend college.

48. There is no evidence to believe that Father would make educational decisions for [Z.T.H.] that are contrary to [Z.T.H.]'s best interests.

49. The evidence suggests that Father is able to meet [Z.T.H.]'s emotional needs. All parties agree that Father and [Z.T.H.] have a strong and close relationship.

50. No evidence was presented that [Z.T.H.] has had any difficulty adjusting to Father's relocations to Zionsville, and Father's extended parenting time as provided by the Mediated Agreement.

51. There is no evidence to suggest that the affections of [Z.T.H.] and the Ketners have become so interwoven that to sever them would seriously mar and endanger [Z.T.H.]'s future happiness.

52. [Z.T.H.] wishes to live with Father.

53. Even though Father does not have an extensive work history, and may not

have what is considered traditional employment, the Court finds Father can provide for [Z.T.H.]'s needs. The Court does not equate Father's lack of traditional and steady employment with being a poor role model for [Z.T.H.].

54. The Ketners have had [Z.T.H.]'s care and custody since December 22, 1994. *Although the Court acknowledges the length of time of the Ketners' care, with Father's acquiescence,* the Court finds that Father has maintained a strong relationship with [Z.T.H.].

55. The Court has reviewed Dr. Lawlor's Custody Evaluation Report and Update Evaluation. The Court finds that Dr. Lawlor's Custody Evaluation Report and Update Evaluation does not apply the applicable standard of review in this instance where a natural parent seeks custody of his minor child as opposed to custody remaining with a third party. Further, the Court finds that Dr. Lawlor's Custody Evaluation Report and Update Evaluation does not rebut the presumption in favor of Father having custody of [Z.T.H.]. The Court declines to follow Dr. Lawlor's recommendation.

56. Father and the Ketners each submitted records of Father's child support payment history certified by the Clerk of this Court. The records contained by Father are more complete and the Court finds that Father has paid the sum of Two Thousand Fifty Dollars ($2,050.00) in child support since December 22, 1994. There is a total of Four Thousand Five Hundred and Forty Dollars ($4540.00) due in child support from December 22, 1994 through September 8, 2003.

\*     \*     \*     \*     \*     \*

### CONCLUSIONS OF LAW AND JUDGMENT

\*     \*     \*     \*     \*     \*

2. The applicable legal standard when a parent seeks custody of his child as opposed to the custody being placed with another person is that there is a strong presumption that the child's best interests are served by placement in the custody of the natural parent. In order to overcome this presumption, the trial court must be satisfied by clear and convincing evidence that the best interests of the child require placement with the third party.

3. Placement of a child with a person other than a natural parent must represent a substantial and significant advantage to the child. The presumption is not rebutted because a third person can provide better things in life for the child.

4. The applicable standard of review is the same even if, as in this instant case, a third party already has care and custody of a minor child and a natural parent seeks a modification of the child's custody.

5. In this instance there is an important and strong presumption in favor of Father having custody of [Z.T.H.]. As third parties wishing to retain custody, the Ketners have the burden to rebut by clear and convincing evidence the presumption in favor of Father. While the Ketners may be able to provide more and better things for [Z.T.H.], their continued custody does not represent a substantial and significant advantage to the child.

6. In considering this standard, the evidence presented at the hearing, the exhibits admitted at hearing, Dr. Lawlor's Custody Evaluation Report and Update Evaluation, the Court concludes that *the Ketners have failed to rebut by clear and convincing evidence the important and strong presumption in favor of Father having custody of [Z.T.H.].*

7. The Court concludes that Father's request for custody of [Z.T.H.] be and hereby is granted. Father is entitled to legal and physical custody of his minor son. This determination is in the child's best interests....

App. pp. 7–18 (emphases added) (citations omitted).

■ Indiana courts have continuously recognized that the parental presumption may be rebutted with evidence of a parent's "long acquiescence," in a third party having custody of a child. *Hendrickson v. Binkley,* 161 Ind.App. 388, 394, 316 N.E.2d 376, 380 (1974), *cert. denied,* 423 U.S. 868, 96 S.Ct. 131, 46 L.Ed.2d 98 (1975); *see B.H.,* 770 N.E.2d at 286–87. The trial court found that Horan acquiesced to the Ketners' custody of Z.T.H. *See* App. p. 14. Having found that Horan acquiesced to the Ketners' custody of Z.T.H., the trial court's conclusion that the Ketners failed to rebut the parental presumption is clearly erroneous.

■ Because the Ketners rebutted the parental presumption with clear and convincing evidence, they should have been in the same position as any custodial parent objecting to a petition to modify custody. Accordingly, we remand for a hearing in which Horan has the burden of establishing that the modification of custody is in Z.T.H.'s best interests and that there has been substantial change in circumstances. *See* I.C. § 31–14–13–6. Such a hearing also gives the Ketners an opportunity to

specifically rebut any evidence set forth by Horan.

At first blush, it might appear futile to remand for a new hearing on Horan's petition to modify because in denying the Ketners' motion to correct error the trial court indicated that regardless of the legal standard it applied, placing Z.T.H. in Horan's custody was proper.[9] Specifically, the "minutes of the court" denying the Ketners' motion to correct error provide in part:

1. The Court finds that the legal standards articulated in "In Re: the Guardianship Of B.H. & S.H.," 770 N.E.2d 283 (Ind.'02) and "In the Matter Of Paternity of V.M., A.M., & V.B., Victor Benavides v. Moore," 790 N.E.2d 1005 (Ind. App.2003) are controlling in this case. The Court disagrees that *B.H. & S.H.* only applies to a guardianship case; there is nothing in that case or any other which prohibits its application to a paternity case. The *Benavides* case is directly on point with this Court's case. In fact, it is interesting that Grandparents wish for the Court to reach the same outcome in Benavides, but not use the same legal standard.

2. The Court would further find that, even if the modification standard had been used (under I.C. 31–14–3–2), the Court's order would be unchanged. There was sufficient evidence to find a substantial change in the wishes of the child, and the wishes of Father.[10]

3. Regardless of which legal standard is applied the Court has already found,

---

9. We note that in their notice of appeal, the Ketners challenge only the trial court's August 30, 2004 order and not the denial of their motion to correct error.

10. We have recently reiterated the longstanding rule that a change in the child's wishes alone does not support a modification of custody. *Williamson v. Williamson,* 825 N.E.2d 33, 40 (Ind.Ct.App.2005). We also question

whether a change in the wishes of the parent seeking custody alone would support a modification because it is inherent in any petition to modify that the non-custodial parent wishes to obtain custody. We do not believe that this factor was intended to support a modification where a non-custodial parent has simply changed his or her mind.

and would continue to find, that an award of custody to Father is in the child's best interests.

4. The Court .does not find that it abused its discretion. All of the evidence was carefully considered, and the presumption held by Father as the natural parent was not rebutted.

App. pp. 20–21.

However, if the Ketners did not rebut the parental presumption, as the trial court erroneously concluded, then, logically, Horan had no obligation to establish that modification was proper. *See L.L.,* 745 N.E.2d at 233 (ending analysis where findings were insufficient to show that grandparent rebutted the parental presumption). Because the trial court concluded that the Ketners did not rebut the parental presumption, it is difficult to accept that the trial court would have then placed them on a level playing field with Horan in determining whether he had established that the modification of custody was proper for purposes of the motion to correct error.

Further, many of the trial court's extensive findings in its custody order focus on the lack evidence to show that Horan should not be awarded custody. For example, in addressing Horan's lifestyle, Finding 42 provides, "However, the Ketners cannot substantiate their concerns and cannot point to anything about Father's behavior or lifestyle that would make an award of custody to father inappropriate." App. p. 13. Regarding Horan's healthcare-related decisions, Finding 46 provides, "There is no evidence to believe that Father would make health and medically related decisions for [Z.T.H.] that are contrary to [Z.T.H.]'s best interests." *Id.* In terms of Horan's education expectations for Z.T.H., Finding 48 provides, "There is no evidence to believe that Father would make educational decisions

for [Z.T.H.] that are contrary to [Z.T.H.]'s best interests." *Id.* Concerning to Z.T.H.'s relationship with the Ketners, Finding 51 provides, "There is no evidence to suggest that the affections of [Z.T.H.] and the Ketners have become so interwoven that to sever them would seriously mar and endanger [Z.T.H.]'s future happiness." *Id.* at 14.

These findings indicate that the trial court improperly required the Ketners both to rebut the parental presumption and to show that modifying custody was not in Z.T.H.'s best interests. After rebutting the parental presumption, the Ketners were under no affirmative obligation to address the modification question. Rather, Horan, as the person seeking to modify custody, had the burden.

The trial court's initial focus on the parental presumption and its impact on Z.T.H.'s best interests was proper; however, the trial court must also ensure "that the policy of stability remains a guiding factor in determining whether a custody order should be modified." *Bryant v. Bryant,* 693 N.E.2d 976, 979 (Ind.Ct.App. 1998), *trans. denied.* Because the Ketners have rebutted the parental presumption, this case is like any other modification proceeding, in which "[t]he welfare of the child, not the wishes and desires of the parents, is the primary concern of the courts." *In re Paternity of M.J.M.,* 766 N.E.2d 1203, 1209 (Ind.Ct.App.2002). Whether Horan can establish that modification is proper under the parameters of today's decision is a matter for the trial court's determination on remand.

### Conclusion

Applying the parental presumption and the modification standard protects the best interests of a child who has been in the long-term permanent custody of a third party as well as the parent's constitutional rights. The Ketners rebutted the parental

presumption with evidence of Horan's long-term acquiescence, and the trial court's conclusions to the contrary are clearly erroneous. Because the Ketners rebutted the parental presumption, we remand for a hearing at which Horan must establish that modification is proper. We reverse and remand.

Reversed and remanded.

NAJAM, J., concurs.

CRONE, J., dissents with separate opinion.

CRONE, Judge, dissenting.

At the outset, I applaud Judge Barnes's thoughtful analysis of the cases guiding our resolution of the procedural issue before us today. I draw the same lessons from those precedents, and I agree with the majority that a synthesis of the "parental presumption" and "best interests" standards is the proper means of protecting a parent's rights and a child's best interests where the parent seeks to modify the long-term permanent custody of a third party. I also agree with the majority that the Ketners rebutted the parental presumption with evidence that Horan acquiesced to their custody of Z.T.H. and that the trial court's conclusion to the contrary is clearly erroneous.

I must respectfully disagree, however, with the majority's suggestion that the Ketners were therefore not "in the same position as any custodial parent objecting to a petition to modify custody" and that the appropriate solution is to "remand for a hearing in which Horan has the burden of establishing that the modification of custody is in Z.T.H.'s best interests and that there has been a substantial change in circumstances." Op. at 257. Simply because the trial court believed that Horan did not have the burden of establishing that modification is in Z.T.H.'s best inter-

ests and that there has been a substantial change in circumstances does not mean that Horan failed to present sufficient evidence to meet this burden. Indeed, in its ruling on the Ketners' motion to correct error, the trial court specifically found that Horan had met this burden regardless of the applicable legal standard. Appellants' App. at 20–21.

I believe that sufficient evidence exists to support this finding. Horan moved from Greene County to Zionsville, where he is willing to remain until Z.T.H. finishes high school. Horan has demonstrated an interest in Z.T.H.'s medical care and education, obtained stable employment, and initiated a program at the Boys and Girls Club that Z.T.H. attends. These examples demonstrate a substantial change in circumstances, not merely a change of mind on Horan's part. Also, the trial court found that Horan and Z.T.H. "have a strong and close relationship" and that Z.T.H. wishes to live with Horan, which lends support to its finding that modification of custody is in Z.T.H.'s best interests. *Id.* at 17.

I do not believe that the trial court failed to place the Ketners "on a level playing field with Horan" in determining the best placement for Z.T.H. *Id.* at 21. More importantly, in view of its numerous detailed findings, I do not believe that the trial court would reach a different result were it to hold another hearing "under the parameters of today's decision[.]" *Id.* at 23. Recently, our supreme court reiterated that "appellate courts give considerable deference to the findings of the trial court in family law matters[.]" *MacLafferty v. MacLafferty*, 829 N.E.2d 938, 940 (Ind. 2005). The court explained,

[T]his deference is a reflection, first and foremost, that the trial judge is in the best position to judge the facts, to get a feel for the family dynamics, to get a sense of the parents and their relation-

ship with their children—the kind of qualities that appellate courts would be in a difficult position to assess. Secondly, appeals that change the results below are especially disruptive in the family law setting. And third, the particularly high degree of discretion afforded trial courts in the family law setting is likely also attributable in part to the "fluid" standards for deciding issues in family law cases that prevailed for many years.

*Id.* at 940–41 (citations omitted).

I wholeheartedly endorse the majority's "solidification" of standards in this area of family law and believe that it will offer valuable guidance to trial courts in similar situations. Also, I appreciate the majority's concern for giving the parties an opportunity to present evidence in a manner consistent with those standards. It is clear that the trial court found that application of those standards would not have changed the outcome, and I believe we should give due deference to the trial court and affirm its decision in the interests of stability and finality. Therefore, I respectfully dissent.