## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Mar 09 2016, 8:45 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Julie A. Camden
Camden & Meridew, P.C.
Fishers, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re: The Marriage of:

Christine Toney,

*Appellant-Petitioner,*

v.

Edward Thomas,

*Appellee-Respondent.*

March 9, 2016

Court of Appeals Cause No. 06A05-1503-DR-121

Appeal from the Boone Superior Court

The Honorable Matthew C. Kincaid, Judge

Cause No. 06D01-0910-DR-724

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Petitioner, C.T. (Mother), appeals the trial court's Order modifying physical custody of her minor child, G.T., (Child), in favor of Appellee-Respondent, E.T. (Father).

We affirm.

## ISSUES

Mother raises four issues on appeal, which we restate as follows:

(1) Whether the trial court abused its discretion in denying Mother's motion for continuance;

(2) Whether the trial court abused its discretion in admitting certain evidence;

(3) Whether the trial court abused its discretion in admitting hearsay evidence; and

(4) Whether the trial court abused its discretion by modifying Mother's physical custody of the Child.

## FACTS AND PROCEDURAL HISTORY

Mother and Father were married on September 29, 2006. On September 24, 2007, the couple welcomed the Child. Subsequently, the parties divorced in January 2010, and on January 19, 2010, pursuant to a property and child settlement agreement (Agreement), the parties agreed that Father and Mother would share joint legal custody of the Child, with Mother having primary physical custody. Father would exercise parenting time from 6:00 p.m. Wednesday until 6:00 p.m. Thursday, and every other Saturday from 6:00 p.m.

until 6:00 p.m. Sunday. Holiday parenting time was governed by the Indiana Parenting Time Guidelines (Guidelines). Additionally, parties were required to comply with the provisions of Indiana Code section 31-1.7-2.2-1 requiring notice prior to any intended move.

[5] Both parties remarried - in September 2010, Mother married M.T., and in April 2014, Father married E.T. In July 2011, M.T. was arrested and charged with domestic battery, a Class A misdemeanor, for hitting Mother. The probable cause affidavit indicated that the domestic violence was not an isolated incident and that M.T. had battered Mother on at least five prior occasions. On January 4, 2012, M.T.'s case was dismissed but was reopened on January 27, 2012, under a different cause number. On October 3, 2012, the trial court conducted M.T.'s bench trial, finding M.T. guilty as charged. M.T. was sentenced to 180 days in Boone County Jail, with 176 days suspended to probation. On April 11, 2014, Mother and M.T. divorced.

[6] On July 31, 2014, Father filed a Verified Petition to Modify Custody and Child Support. On February 12, 2015, the trial court held the modification hearing. Father introduced evidence that after the divorce was finalized, Mother moved five times causing the Child to be enrolled in six different schools in a span of five years. Father also stated that Mother had failed to consult him in the school changes. Additionally, each time Mother moved, Father relocated to be closer to the Child. Father noted that he incurred great expense with Mother's relocations. With regard to parenting time, Father stated that Mother had significantly increased his parenting time in 2013 and 2014; however, following

a disagreement in May 2014 regarding the Child's summertime activities, Father voluntarily reduced his parenting time to that set forth in the Agreement. During the course of the hearing, Father requested primary physical and sole legal custody of the Child or, in the alternative, to re-affirmed joint physical and legal custody with the exception that the Child be enrolled in the Avon School District where he resided. In turn, Mother requested re-affirmance of the current custody arrangement with the Child remaining in the Zionsville School District.

[7] Father stated that he and wife, E.T., were expecting a child and that the Child was excited about having a younger sister. Father indicated that unpleasant interactions between Mother and E.T. occurred in front of the Child, thus, causing distress to the Child and E.T. Additionally, Father claimed that Mother often sent profanity-filled texts and emails to E.T. Additionally, Father claimed that he was troubled by the Child wetting the bed, and expressing fear at night while visiting with them. The Child was not exhibiting such behavior at Mother's home. Father claimed that he had approached Mother multiple times about enrolling the Child in counseling, but Mother was not in favor of it. Despite Mother's delays, Father placed the Child in counseling sessions. Father stated that the counselor treated the Child for anxiety as a result of numerous changes occurring in Father's life, including his marriage to E.T. and the birth of his second child due in May 2015.

[8] Father also claimed that Mother abused alcohol. Specifically, Father stated that on one occasion, he had to make an unplanned trip to the airport to pick

up the Child since Mother was too intoxicated to drive. In addition, Father sought to impeach Mother's credibility by introducing testimony of M.W., Mother's college friend, to testify that Mother had confided in her about the domestic violence that Mother suffered during her marriage to M.T. According to M.W., Mother had indicated that domestic violence included M.T. hitting her, throwing her up against walls like a ragdoll, and sodomizing her with a sex toy. M.W. testified that on at least two occasions, Mother had fled to her house after being battered by M.T. M.W. also claimed that M.T. called the Child, who is biracial, derogatory racial names.

[9] In response to Father's allegations, Mother denied that there were multiple incidents of abuse by M.T. Mother admitted that she had sent foul messages to E.T.; however, she had apologized to E.T. for her behavior. With regard to the Child's counseling, Mother indicated that she had not participated in any of the sessions, but had discussed the sessions with the Child. With regard to being intoxicated on her flight back to Indianapolis, Mother stated that she only drank a glass of wine on her flight, and the reason she called Father to pick up the Child from the airport was because she was headed home to argue with M.T. about getting a divorce. Mother asked the court to maintain the current custody arrangement with the Child remaining in the Zionsville School District.

[10] At the close of the evidence, the trial court took the matter under advisement. On February 18, 2015, the trial court issued its findings of fact and conclusions thereon granting Father sole legal and physical custody of the Child with

Mother to have parenting time according to the Indiana Parenting Time Guidelines.

[11] Mother now appeals. Additional information will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Motion to Continue*

[12] Mother first argues that the trial court abused its discretion in denying her motion to continue. Specifically, Mother contends that the trial court's denial of her continuance request was based on Father's non-compliance with the discovery of Exhibits on which he relied at the modification hearing. As such, Mother claims that she was subjected to unfair surprises at trial.

[13] In resolving this issue, we initially note that the decision to grant or deny a motion for a continuance is within the sound discretion of the trial court. *Litherland v. McDonnell*, 796 N.E.2d 1237, 1240 (Ind. Ct. App. 2003), *trans. denied*. We will reverse the trial court only for an abuse of that discretion. *Id*. "An abuse of discretion may be found on the denial of a motion for a continuance when the moving party has shown good cause for granting the motion." *Rowlett v. Vanderburgh Cnty. Office of Family & Children*, 841 N.E.2d 615, 619 (Ind. Ct. App. 2006), *trans. denied*; *see* Trial Rule 53.5. A trial court abuses its discretion when it reaches a conclusion which is clearly against the logic and effect of the facts or the reasonable and probable deductions which may be drawn therefrom. *Hess v. Hess*, 679 N.E.2d 153, 154 (Ind. Ct. App. 1997). If good cause is shown for granting the motion, denial of a continuance

will be deemed to be an abuse of discretion. *Id.* No abuse of discretion will be found when the moving party has not shown that he was prejudiced by the denial. *Litherland*, 796 N.E.2d at 1240.

[14] "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request was denied." *J.P. v. G. M.*, 14 N.E.3d 786, 790 (Ind. Ct. App. 2014).

[15] The record shows that on January 2, 2015, Mother submitted her first set of interrogatories and requests for production. On January 21, 2015, Father served his first interrogatories and requests for production on Mother. On February 3, 2015, Father made some responses to Mother's requests, but failed to submit any exhibits that he would present at trial. On the same day, Father filed a motion to reduce the time Mother had to respond to his discovery requests. On February 6, 2015, the trial court denied Father's motion. Because Father had failed to submit any exhibits, on February 10, 2015, Mother filed a motion to continue the modification hearing set for February 12, 2015. Mother's request was denied and the matter proceeded to trial. At the

modification hearing, Father introduced eight Exhibits, A through H[1] (A-H). Mother maintains that she "endured one unfair surprise after another when Father introduced eight trial exhibits which he never bothered to show Mother prior to trial . . . ." (Appellant's Br. p. 17). Mother argues that Father's submission of Exhibits A-H was in bad faith, and "in retaliation for learning that he would not receive Mother's discovery responses before the [modification] hearing . . . ." (Appellant's Br. p. 18).

[16] Mother relies on *Stamper v. Hyundai Motor Co.*, 699 N.E.2d 678, 683, (Ind. Ct. App. 1998), *trans. denied*, holding that "[w]here there has been a failure to comply with discovery procedures, the trial judge is usually in the best position to determine the dictates of fundamental fairness and whether any resulting harm can be eliminated or satisfactorily alleviated. Where remedial measures are warranted, a continuance is usually the proper remedy, but exclusion of evidence may be appropriate." While the exclusion of Father's exhibits at trial may have been an appropriate remedy for Father's discovery violation, we find Mother's assertions that she was unprepared to rebut the evidence submitted by Father unpersuasive.

---

[1] We note that Mother does not specifically challenge the admission of Exhibits E through H which were the Child support worksheets.

[17] An issue at the modification hearing was the argument that Mother had moved constantly therefore not providing the Child with a stable home environment. Father introduced Exhibit A—Mother's and M.T.'s divorce decree—stating that "if [Mother] doesn't refinance the house by May [1, 2015], then the house is sold." (Tr. p. 16). Father stated that he had seen a for sale sign outside Mother's home, and Mother had expressed to him that she could not afford to refinance her home and was moving to Westfield, Indiana. Father indicated that move would be Mother's sixth move in a span of five years. Mother argues that "had she known that Father would focus on the property division of [her] divorce from her second husband in this child custody matter involving her child from her first marriage, Mother would have collected evidence in response." (Appellant's Br. p. 19). Before admitting Exhibit A, the trial court stated, "I am having a hard time conceiving prejudice here. It's her cases [sic] decree. She is aware of what's in it [] I'm going to admit it over a timeliness objection." (Tr. p. 15).

[18] In her appellate brief, Mother now argues that "[f]or instance, she could have provided documents showing her ability to refinance her home or her uncle's purchase of 1/3 of the equity of her home and payment of 1/3 of the mortgage." (Appellant's Br. p. 19). On direct examination at trial, Mother acknowledged that in 2014, she had articulated to Father that she could not afford to refinance her house and she intended to move. Mother indicated that she had put an offer on a house in Westfield, but the offer fell through. Nonetheless, Mother stated that she had no plans on moving out of her home

since she had "a new job and so now I can afford my home." (Tr. p. 83). Mother also testified that her uncle had purchased 1/3 equity of her home and was making mortgage payments. Here, Mother made adequate responses by disproving Father's assertion that she was relocating. Accordingly, we find no prejudice in the trial court's admission of Exhibit A.

[19] With regards to Exhibit B, Father stated in his petition that Mother had exposed the Child to domestic violence. In summary, Exhibit B included M.T.'s arrest record - probable cause affidavit, charging Information, a subpoena ordering Mother to appear for M.T.'s trial, an order finding Mother in contempt for failing to appear for M.T.'s trial, a letter by Mother addressed to the trial court explaining her reasons for failing to appear for M.T.'s trial, and M.T.'s sentencing order. Exhibits C and D were Chronological Case Summaries (CCS) relating to M.T.'s domestic violence case against Mother. The trial court overruled Mother's objections on the basis of relevance.

[20] Mother does not dispute the domestic violence incident; however, she argues that she had no knowledge as to the contents of Exhibits B, C, and D, nor did she have an opportunity to "verify if the documents were accurate." (Appellant's Br. p. 19). As such, Mother claims that she was unable to adequately defend herself at the hearing. Notwithstanding her claim, Father's petition requesting modification of custody put her on notice that the domestic violence she endured in her second marriage would arise at the modification hearing. Moreover, Mother was the victim of the domestic violence and was subpoenaed as a witness.

In addition, Mother claims that the probable cause affidavit in Exhibit B contained prejudicial statements. Specifically, Mother complains that the statement indicating that M.T. "had placed a gun in his mouth and threatened to shoot himself to get his way" was untrue. (Appellant's Br. p. 20). As such, Mother argues that she "could have subpoena[d] witnesses in advance" to contradict that statement. (Appellant's Br. p. 20). The record shows that on the day M.T. abused Mother, Mother's mother, (Grandmother), was present. Grandmother was Mother's witness at the modification hearing, yet Mother did not question her about the prejudicial statements.

Overall, we conclude that none of the reasons offered by Mother were such that a continuance was appropriate two days prior to trial. More significant is that Mother fails to specify how additional time would have enabled her to gather information that could not have been assembled during her general trial preparation. Because Mother has the burden of showing that the trial court abused its discretion by denying her request for a continuance, we will not presume prejudice where she has provided no particularized information from which we could conclude that she was indeed prejudiced.

## II. *Impeachment*

Next, Mother contends that Father called her to the stand for the sole purpose of impeaching her. Procedurally, Ind. Trial Rule 43(B) provides in relevant part that a party "may call an adverse party . . . and interrogate him by leading questions and contradict and impeach him in all respects as if he had been called by the adverse party." This precept is complemented by Ind. Evidence

Rule 607, which states that "[t]he credibility of a witness may be attacked by any party, including the party calling the witness." However, a party is not permitted to call a witness for the sole purpose of introducing otherwise inadmissible evidence under the guise of impeachment. *Herron v. State*, 10 N.E.3d 552, 556 (Ind. Ct. App. 2014) (citing *Appleton v. State*, 740 N.E.2d 122, 124 (Ind. 2001)).

[24]     As stated previously, Father made several claims against Mother in his petition to modify custody. Father called Mother to the stand to question her about her housing situation, the domestic violence she endured, the Child's schooling, and parenting time. Prior to Mother's objection regarding the reading into the record of certain text messages and emails that Mother and Father had exchanged, Father asked Mother if she remembered texting Father that she was moving out of her home in 2014, and Mother answered in the affirmative. Father then questioned Mother if she had deprived Father of contact with the Child while she was in her custody. Mother stated that she could not recall ever doing so. Father sought to impeach Mother by introducing text messages to impeach Mother's testimony. At that point, Mother's counsel objected by stating that the text messages were not part of discovery. In response, Father's counsel stated "I am just asking to impeach your client. She is [in] . . . possession of the same texts and emails that my client is." (Tr. p. 102). The trial court then overruled Mother's objection. Mother relies on this exchange to support the argument that she was called merely to be impeached. We disagree.

Mother indicated that she could not recall denying Father parenting time, and Father sought to refresh her memory by showing her the text messages. Mother then acknowledged that she had on more than one occasion denied Father contact with the Child. Accordingly, Mother's assertion that Father called her to the stand for the sole purpose of impeaching her is inaccurate and not supported by the record. We therefore conclude that the trial court did not abuse its discretion by allowing Father to impeach Mother with the text messages.

### III. *Hearsay*

Also, Mother asserts that the trial court abused its discretion by admitting certain hearsay statements. Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Ind. Evidence Rule 801(c). Generally, hearsay is not admissible. Evid. R. 802. "Whether a statement is hearsay . . . will most often hinge on the purpose for which it is offered." *Blount v. State*, 22 N.E.3d 559, 565 (Ind. 2014). In this regard, "[o]ut-of court statements that are offered for a purpose other than to prove the truth of the matter stated are not hearsay." *Patton v. State*, 725 N.E.2d 462, 464 (Ind. Ct. App. 2000).

Even when hearsay evidence is improperly admitted, reversal may not be predicated upon this erroneous admission of evidence unless the admission is inconsistent with substantial justice. *See Weinberger v. Boyer,* 956 N.E.2d 1095, 1104 (Ind. Ct. App. 2011), *trans. denied*. Therefore, the improper admission of

evidence is harmless error when the judgment is supported by substantial independent evidence to satisfy the reviewing court that there is no substantial likelihood that the questioned evidence contributed to the judgement. *D.W.S. v. L.D.S.*, 654 N.E.2d 1170, 1173 (Ind. Ct. App. 1995). When a case is tried to the bench, we presume that the court ignored inadmissible evidence in reaching its judgment. *Estate of Fowler v. Perry*, 681 N.E.2d 739, 744 n.2 (Ind. Ct. App. 1997), *trans. denied*.

[28] Mother directs us to three instances of alleged hearsay: M.W.'s testimony where she repeated Mother's statements that M.T. called the Child disparaging names; the counselor's testimony stating that the Child had expressed to him that she was anxious; and Father's wife's testimony as to the Child's statements during an exchange. Mother maintains that the trial court abused its discretion in overruling her objections as these statements amounted to inadmissible hearsay.

[29] During Father's direct examination of M.W., Father questioned M.W. about M.T.'s abuse of Mother. At a certain point in the questioning, Father asked M.W. if she believed the Child "was around the abuse?" (Tr. p. 136). The contested exchange continues as:

> [Father]: Um, what sorts of--can you describe the abuse further what--what [Mother] said to you?

> [M.W.]: Um, it was a lot of verbal abuse. Um, calling her names, uh, using derogatory terms towards [the Child], uh –

[Father]: Can you describe what those--what--what did [M.T.] call [the Child]?

[M.W.] Racially, he called her racially derogatory terms.

[Mother]: Objection calls for hearsay.

(Tr. pp. 136-37). We fail to discern how the above exchange amounts to hearsay. Although Father invited M.W. to specifically elaborate on the abuse, M.W. only responded by giving descriptions about the abuse, she did not respond by giving a statement that could even remotely be characterized as hearsay.

[30]     However, after the questioning continued, Father's counsel clearly and explicitly asked M.W. to elaborate as to "what names did [Mother] tell [her], if any, that [the Child] was called by [M.T.]" (Tr. p. 138). Even though M.W. responded with explicit statements, Mother's counsel failed to lodge an objection. Accordingly, in so far Mother now contests the admissibility of this statement, her argument is waived. *See M.S. v. C.S.*, 938 N.E.2d 278, 285 (Ind. Ct. App. 2010) (a party waives appellate review of an issue or argument unless the party raised that issue or argument before the trial court).

[31]     Next, Mother disputes the trial court's ruling during the counselor's testimony. During the testimony, Father asked the counselor "what have you been seeing [the Child] for?" The counselor responded "Um, for, um, adjusting to her parent's being divorced and she's expressed that being anxious and sometimes--" (Tr. pp. 145-46). Mother objected on hearsay grounds. The trial court

overruled, noting "[h]e hasn't offered any out of court statements. Overruled. Go Ahead. You are seeing her because she is anxious is what you said, right." (Tr. p. 146).

[32] Even if we agree that the counselor made a possible hearsay statement by recounting the Child's answers to him, we are mindful that this case was tried to the trial judge and not to a jury. As we noted, when a case is tried to the bench, we presume that the court ignored inadmissible evidence in reaching its judgment. *Estate of Fowler*, 681 N.E.2d at 743 n.2. This is exactly what the trial court did in the instant cause. Instead of going through a lengthy questioning to reach the same result that the Child was treated for anxiety, after sustaining the objection the trial court rephrased the counselor's answer without the presumed hearsay statement.

[33] Lastly, Mother argues that the trial court abused its discretion in admitting E.T.'s testimony recalling an incident from December of 2014. Specifically, E.T. and Father dropped off the Child at a local Starbucks so the Child could visit with Mother. E.T. stated that she and Father walked the Child over to Mother's car, and in the presence of the Child, Mother told Father, "tell your fat cow of a wife to stay in the car[,] she is not welcome by my car. . . . [the Child] heard that and [the Child] got into the car and [] I walked back to my car." (Tr. p. 157). E.T. further testified that the Child "would bring it up the next time she saw me and ask if [] I was okay. . . ." (Tr. p. 157). At that point, Mother's counsel made a hearsay objection. Before Father's counsel could respond, the trial court overruled that objection on the ground that E.T.'s

testimony was "not offered for the truth of the matter asserted." (Tr. p. 158). Mother now posits that the "evidence was highly prejudicial to Mother because it was the only evidence showing [that the Child] actually heard disagreements between Mother, Father and [E.T.] during exchanges." (Appellant's Br. p. 24). We disagree. The question triggering the objectionable statement focused on how many times E.T. had met Mother and what her experience was. In her response, E.T. described the pick-up and how Mother behaved. We agree with the trial court that the statement was not being offered to prove that the Child heard the argument between Mother, Father and E.T., but rather to establish the nature of E.T.'s interactions with Mother. Accordingly, we find no error and affirm the trial court.

## IV. *Modification of Custody*

### A. *Standard of Review*

In this case, the trial court entered findings of fact and conclusions thereon in its Order granting Father primary physical and legal custody of the Child. Pursuant to Indiana Trial Rule 52(A), our court will "not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of witnesses." *D.C. v. J.A.C.*, 977 N.E.2d 951, 953 (Ind. 2012). Where, as here, the trial court entered such findings and conclusions *sua sponte*, the specific findings control only as to the issues they cover, and while a general judgment standard applies to any issue upon which the trial court has not found, we may affirm a general

judgment on any theory supported by the evidence adduced at trial. *Sexton v. Sedlak*, 946 N.E.2d 1177, 1183 (Ind. Ct. App. 2011), *trans. denied*.

[35] In addition, there is a well-established preference in Indiana "for granting latitude and deference to our trial judges in family law matters." *Swadner v. Swadner*, 897 N.E.2d 966, 971 (Ind. Ct. App. 2008) (quoting *In re Marriage of Richardson*, 622 N.E.2d 178, 178 (Ind. 1993)). "[A]ppellate courts 'are in a poor position to look at a cold transcript of the record, and conclude that the trial judge, who saw the witnesses, observed their demeanor, and scrutinized their testimony as it came from the witness stand, did not properly understand the significance of the evidence.'" *D.C.*, 977 N.E.2d at 956-57 (quoting *Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002)). Our State's courts have long emphasized a concern that there be finality in matters concerning child custody. *Baxendale v. Raich*, 878 N.E.2d 1252, 1258 (Ind. 2008). "Modification of custody is an area committed to the sound discretion of the trial court, and we are constrained to neither reweigh evidence nor judge the credibility of witnesses." *Jarrell v. Jarrell*, 5 N.E.3d 1186, 1190 (Ind. Ct. App. 2014), *trans. denied*.

## B. *Findings of Fact*

[36] Prior to turning to the main issue - whether the trial court abused its discretion by awarding Father primary physical and legal custody of the Child - we address Mother's contention that several of the trial court's *sua sponte* findings are not supported by the evidence and therefore are clearly erroneous and should be set aside.

### 1. *Findings relating to M.T. and the Domestic Violence*

[37]    Mother contests the following findings relating to M.T.:

> 12.  Notwithstanding the divorce, Father has been to Mother's residence and observed [M.T.] present after the divorce. Mother told the Court that [M.T.] is better and that he does in fact visit the home. That [M.T.] "is better" is supported by nothing other than Mother's self-serving testimony which the Court discounts. That [M.T.] continues to visit the home even after a criminal case, a conviction and a divorce is a true fact.
>
> ****
>
> 15.  Mother testified that M.T. committed a single incident of domestic violence upon her. The Court does not believe her.
>
> 16.  Additionally, it appears to the Court more likely than not that Mother's now ex-husband has made racial slurs about [the Child] and her father. Father and Mother appear to the court to be of mixed racial background.
>
> 17.  Mother did not call M.T. as a witness.
>
> ****
>
> 25.  A friend of Mother's from college, a person she had kept in close contact during periods of her relationship with [M.T.] was called to testify and she testified that Mother confessed to her several instances of abuse inflicted upon her by [M.T.]. The court found this witness to be credible. She appeared to be truthful and the court discerns no bias or interest which would tend to cause her to be untruthful. Her testimony of what Mother told her that [M.T.] did to her and the things he said—party opponent admission—were sad and disturbing.
>
> ****
>
> 46.  The impact of domestic violence in this question is difficult. Mother was the victim. She is not the party who inflicted the domestic violence. She should not be punished for having an abusive husband and that is not what the Court is doing.

47. But Mother keeps him around even now after the divorce and had be forced under the criminal court's powers of contempt to testify. Even now she minimizes the significance of this criminal behavior. This relationship which she had the right to start, to stay in and pursue even now is harmful to [the Child]. The court cannot make her leave her abuser and the Court declines to judge her personal character. It is troublesome that [M]other would stay with a man who would express and presumptively think negative things about her daughter's racial background.

48. The judgment the Court will make is that the circumstances of abuse and abusiveness have not been in [the Child's] best interest . . . .

****

56. Returning to the unpleasant subject of [M.T.] Mother loves her daughter very much, but contact with [M.T.] is not in [the Child's] best interest. It would, the Court finds and concludes, harm [the Child] emotionally to be in [M.T.'s] presence where he is at risk to make bigoted statements about her or her father where he is at risk to abuse her [M]other. If [the Child] witnesses domestic violence or expressions of cruelty towards her [M]other or hears her Mother's erstwhile romantic partner express derogatory racial comments[,] that will harm [the Child]. Mother in the exercise of her parenting time, liberal as it is to be, shall not permit [M.T.] to be present during parenting time.

(Appellant's App. p. 6, 7, 8, 11, 13). Mother argues that the above findings "misstate the evidence of domestic violence and are contrary to the trial court's declaration" not to punish her for being a victim of domestic violence. (Appellant's Br. p. 29).

[38] Turning to the record, although M.W. had lost contact with Mother prior to the custody modification hearing, M.W. recalled Mother's narrations of "four to six" domestic violence incidents while Mother was married to M.T. (Tr. p.

135).  M.W. refuted any contention of there being an isolated event of domestic violence.  Specifically, M.W. testified that in "two to three incidents" Mother fled her home.  (Tr. p. 136).  M.W. stated that on one of those occasions, Mother stayed in a hotel, and in the other two, Mother stayed at M.W.'s residence.  M.W. testified that all three times that Mother had fled her home, Mother was accompanied by the Child.  M.W. also recounted that on one instance, Mother had informed her that M.T. had raped Mother.  Specifically, M.W. testified that Mother had reported to her that M.T. threw her against the wall "like a ragdoll" and when Mother fell to floor, she pretended to be unconscious.  (Tr. p. 138).  M.W. further stated that, thinking Mother was unconscious, M.T. used a sex toy to sodomize Mother.  M.W. testified that shortly after the rape incident, Mother lied to M.W. that she was staying with a friend, but M.W. found out that Mother and M.T. were still living together.  In addition, M.W. testified that she had observed several bruises on Mother.  Also, the trial court heard M.W.'s testimony that M.T. called the Child derogatory racial names.  Furthermore, the trial court believed Father's testimony that Mother continued to have M.T. around even after being convicted of domestic violence.

[39]     Here, the trial court found Father's and M.W.'s testimony regarding the domestic violence credible and truthful.[2] We are mindful that the trial court has the sole discretion to determine the credibility of the witnesses. *See Tompa v. Tompa*, 867 N.E.2d 158, 163 (Ind. Ct. App. 2007). Mother's arguments in this case consist of her directing our attention to evidence that supports her position and attempting to discredit the evidence and witnesses relied upon by the trial court. This amounts to a repeated request that we reweigh the evidence and assess witness credibility, which we will not do. *See Kirk*, 770 N.E.2d at 307 (cautioning that with respect to custody modifications, appellate courts "are in a poor position to look at a cold transcript of the record, and conclude that the trial judge, who saw the witnesses, observed their demeanor, and scrutinized their testimony as it came from the witness stand, did not properly understand the significance of the evidence"). In the instant case, the trial court chose to accept M.W.'s and Father's testimony as true. As such, we conclude that the above findings relating to the domestic violence were not erroneous.

---

[2] Mother notes in her reply brief that Father fails to address each and every finding she challenges. She correctly notes that failure to respond to an issue raised by an appellant is akin to failure to file a brief, and to win reversal on such issue, an appellant need only establish prima facie error. *Frentz v. State*, 875 N.E.2d 453, 463 n. 9 (Ind. Ct. App. 2007), *trans. denied*. Notwithstanding her claim, we find Father's responses, however brief, sufficient to address Mother's contentions.

## 2. *Findings Relating to Mother's Alcohol Abuse*

[40] The trial court found that Mother had an alcohol problem. Specifically, it found:

> 20. The reason Father had to make an unscheduled trip to the airport was that Mother had consumed too much alcohol to safely drive and there was not another driver to transport [the Child].
>
> 21. At the hearing, Mother and Grandmother minimized the drinking during this instance. The Court does not believe them. It was Mother's responsibility not to be in a condition which would endanger [the Child's] safety as a passenger on the roads. She failed.
>
> ****
>
> 24. The Court finds more likely than not, Mother has had a problem with alcohol over the past few years and has contributed to a destabilized environment at home.

(Appellant's App. p. 7). Mother argues that the record contains no evidence that she ever abused alcohol. During the custody modification hearing, Father testified that in 2014, he smelled alcohol on Mother's breath during drop-off. On another occasion, when Father was picking up the Child from Mother's house, Grandmother informed him that Mother was "passed out" in bed. (Tr. p. 59). Lastly, Father testified that in January of 2014, Mother, Grandmother, and the Child were coming back from vacation. Father indicated that he had to make an unscheduled trip to the airport to pick up the Child. Father testified that Mother and Grandmother had been drinking on the flight. Father added that he expressed his misgivings to Mother about drinking on the flight and driving home. Father stated that Mother disregarded his concerns by cussing at

him. Also, Father indicated that Mother had disclosed to him that she was attending alcoholic anonymous meetings to deal with her alcohol problems.

[41] As noted in the foregoing, appellate courts neither reweigh the evidence nor reassesses witness credibility, and it views evidence most favorably to the judgment. *See D.C.*, 977 N.E.2d at 956-57. Here, there was ample evidence that Mother, at the very least, used alcohol. Accordingly, we conclude that the above findings are supported by the record, and Mother's argument to the contrary is an impermissible invitation for us to reweigh the evidence.

### 3. *Other Findings*

[42] Mother also challenges the following findings:

> 26. [] In general, Mother appears in her demeanor to the [C]ourt to be temperamental. She appears to the [C]ourt to be prone to vitriol and stridency.
>
> 27. Father appears to the Court to be the more balanced of the two.
>
> 28. That is not to say that Mother does not love [the Child]. She does. Father admits freely that [the Child] loves her Mother. Father's concern to the Court and it appears well-taken is that he does not want [the Child] to model her [M]other's volatility and manner of dealing with an abuser—*e.g.*, stay with him and attempt to help him avoid a conviction when he battered her.[3]

---

[3] Mother fails to present any argument why this finding is erroneous. Accordingly, she waives it.

\*\*\*\*

30.  Stepmother appears from all the information presented to the [C]ourt to relate kindly to [the Child].  Stepmother also demonstrates good judgement when she decided to no longer travel with Father to pick up or drop off [the Child].[4]

31.  Father has been a very involved parent.  He appears to the [C]ourt to be deeply concerned about [the Child's] welfare.

32.  Mother has moved several times since the divorce.  She has never complied with the relocation statute.  Father has moved as well each time to be closer to [the Child] to minimize travel time to exert his parenting time.  He also has not complied with the relocation statute.  His failure is mitigated somewhat by the reactive nature of his moves and that he has attempted to locate himself closer to [the Child].  Going forward, each party must strictly comply with the relocation statute.

33.  Mother's moves have resulted in a lot of jumbling of [the Child's] preschool.  These moves have occurred without any consultation with Father or input on pre-schooling.  But for two years, she attended Eagle Elementary in Zionsville.  Whether she would be able [to] continue to do so after May of this year is in doubt given the situation with Mother's current residence discussed *infra*.

(Appellant's App. p. 8, 9, 10, 11).

---

[4]  This finding relates to E.T. and how she dialed back her involvement during the exchanges.  In her appellate brief, Mother states, "the statement by the trial court that Father shows wisdom and good parenting" of the Child is unsupported by the evidence. (Appellant's Br. p. 39).  We note that there is no such statement in Finding #30, nor can Finding #30 be interpreted as Mother suggests.

[43] Starting with Finding #26, Mother argues that the trial court's observation that Mother is prone to vitriol and stridency is not consistent with Mother's conduct in the court room. Mother further argues that the only evidence that was presented to display her as being spiteful was through Father's and E.T.'s testimony. At the modification hearing, Mother admitted that her relationship with E.T. for the most part was acrimonious. Mother admitted that she disliked E.T. even before meeting her. On the day Mother met E.T., Mother approached E.T., introducing herself as Father's "bitchy ex-wife" and apologizing for "judging her prior to ever meeting her." (Tr. p. 163). Also, Mother admitted that she sent unpleasant text messages to E.T. Lastly, evidence was presented that Mother acted violently during a drop-off. Specifically, in December of 2014, Father and E.T. were dropping off the Child to Mother at a Starbucks. E.T. testified that she walked the Child over to Mother's car, but Mother was not pleased at seeing E.T., and in front of the Child, Mother informed Father to "tell your fat cow of a wife to stay in the car she is not welcome by my car." (Tr. p. 157). Based on the evidence presented at trial, we do not consider Finding #26 to be erroneous.

[44] Finding #27 stated that Father appeared "to be the more balanced of the two." (Appellant's App. p. 8). Mother makes an incoherent argument in relation to this finding. First, she interprets this finding to mean that the trial court found that Father was more financially stable than her. Next, Mother argues that E.T. disliked her and that she convinced Father to file a custody modification. None of her arguments make sense. Notwithstanding Mother's arguments, we

note that there is a correlation between Finding #26 and Finding #27. Finding #26 talks of Mother's erratic behavior during exchanges. No evidence was offered to show that Father was hostile during exchanges, or that he was unfriendly toward Mother. Finding #27 states that between Mother and Father, Father appears to be the more balanced of the two. Similarly, we find no error with this finding.

[45] As for Finding #31, Mother argues that the record contains little information about Father's involvement in the Child's life. Mother further argues that while Father certainly expressed concern for the Child's welfare in the courtroom, it did not coincide with his "inability to meet his child support obligation for [the Child], his marriage to a woman who immediately became overinvolved in Mother's and Father's parenting issues, and the impending arrival of another child at the time when his salary was modest and he has $115,000 in student debt." (Appellant's Br. p. 40). Again, Mother fails to make a sound argument. The record reveals that Father was involved in the Child's life, and this is established by him keeping up with his parenting time and enrolling the Child for counseling. Also, Father moved each time Mother moved in order to remain close to the Child. Based on the record, we find no error with this finding.

[46] With Finding #32, the trial court found that both Father and Mother had not complied with the relocation statute; however, it regarded Father's failure to comply with the relocation statute *mitigated* by the fact that Father only moved when Mother moved so as to be closer to the Child. Mother's argument starts

and ends with, "both parties are equally culpable for their non-compliance with the statute." (Appellant's Br. p. 40). She offers no further discussion how this finding is erroneous, and she therefore waives her argument.

[47] Finding #33 provided that Mother's moves resulted in the Child changing schools, and that Mother failed to consult Father in the school changes. Mother argues that she was not required to seek Father's permission in the school changes. We disagree. We note that the trial court awarded Father and Mother joint legal custody in 2010. According to Indiana Code section 31-9-2-67, "joint legal custody" means that the persons awarded joint custody will share authority and responsibility for the major decisions concerning the child's upbringing, including the child's education, health care, and religious training. Therefore, Mother's claim that she was not required to consult Father in the Child's schooling is incorrect. Equally, we find no error with this finding.

## C. *Custody Modification*

[48] Turning to Mother's main contention, we note that we review custody modifications for an abuse of discretion, with a "preference for granting latitude and deference to our trial [courts]." *Kirk*, 770 N.E.2d at 307. We will find an abuse of discretion if the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Haley v. Haley*, 771 N.E.2d 743, 747 (Ind. Ct. App. 2002). We do not reweigh evidence or assess the credibility of witnesses, and we consider only the evidence most favorable to the trial court's decision. *Id.* The party seeking modification bears the burden of

proving that the existing custody order should be altered. *Id*. To warrant reversal on appeal, the evidence "must positively require the conclusion contended for by [the] appellant." *Bettencourt v. Ford*, 822 N.E.2d 989, 997 (Ind. Ct. App. 2005).

[49] In order to modify a custody order, the trial court must find that modification would be in the child's best interest and that there has been a substantial change in circumstances since the initial custody order. Ind. Code § 31-17-2-21(a). In this case, the trial court concluded that it was in the Child's best interest to modify custody. In determining a child's best interest, the trial court must "consider all relevant factors," including:

> (1) The age and sex of the child.
>
> (2) The wishes of the child's parent or parents.
>
> (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
>
> (4) The interaction and interrelationship of the child with:
>
> (A) the child's parent or parents;
>
> (B) the child's sibling; and
>
> (C) any other person who may significantly affect the child's best interests.
>
> (5) The child's adjustment to the child's:
>
> (A) home;
>
> (B) school; and
>
> (C) community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a *[de facto]* custodian . . .

I. C. § 31-17-2-8.

In determining that the custody order of 2010 should be modified, the trial court focused on the Child having a stable environment. In this case, when Mother's and Father's marriage dissolved, they agreed that they would share joint legal custody, with Mother having primary custody of the Child. At the modification hearing, Mother testified that she wanted to continue the current arrangement. Father's argument was that it was in the best interest of the Child that he be awarded sole legal and primary custody.

In a joint custody arrangement, the parents share the authority and responsibility for the major decisions concerning the child's upbringing, including the child's education, health care, and religious training. Ind. Code § 31-9-2-67. Under such an arrangement, it is critically important that the parents demonstrate the ability to work together for a common purpose, *i.e.*, the child's best interests. At the modification hearing, Father presented evidence that Mother acted alone on matters affecting the Child. Specifically, Mother believed that she was not under any obligation to consult Father in their daughter's change of schools. The trial court noted that Mother's actions of proceeding unilaterally was disrespectful of Father's role as a legal custodian of the Child. Unlike Mother, Father had displayed the ability to effectively

communicate with Mother. Specifically, the trial court found that Father placed the Child's interests first. When Father noticed behavioral changes in the Child when she visited with them, he consulted Mother about enrolling the Child for counseling. Father proceeded alone only after Mother failed to act on his concern.

[52] Father testified that Mother's many moves made the Child switch schools regularly, and that the Child had no linkage to any home. Father presented evidence that he owned a home in Avon and will not move from that home. Based on Mother's track record, the trial court found that Father would more likely provide a stable home for the Child. Father also presented evidence that he was devoted to the Child's education and wanted the Child to have some consistency. Although Father wanted the Child to be enrolled in the Avon School District, where he lived, at the hearing, Father requested the trial court to have the Child remain in the Zionsville School District for the remainder of the 2014-2015 school year, thus giving the Child some form of consistency and regularity.

[53] On the issue of domestic violence, the trial court indicated that it did not wish to punish Mother for having an abusive husband; however, the trial court noted that Mother, even after divorcing M.T. in 2014, continued to have him visit her home. Furthermore, the trial court found it rather disturbing that Mother tried to diminish the significance of M.T.'s criminal behavior. At trial, Mother claimed that the domestic violence was an isolated incident, yet evidence was presented to show that M.T. had battered Mother several times. In addition,

Mother claimed that the Child did not witness the domestic violence, but M.W. testified that on at least two occasions, Mother had fled her home while accompanied by the Child. Evidence was also presented that M.T. had called the Child derogatory racial names.

[54] In addition, the record shows that there was increased vitriol and stridency since the last custody order. Mother testified that after the custody order in 2010, the parties had effectively co-parented the Child. However, after Father remarried in 2014, her relationship with Father deteriorated rapidly. Mother showed animosity toward Father and E.T. by sending foul text messages. Mother was also hostile toward Father and E.T. at a parenting-time exchange, during which she abused E.T. in front of the Child. The record further shows that when Father filed a petition to modify custody, Mother dialed back contact with Father.

[55] Mother claims that there was no evidence to indicate that the Child's needs were not met under her care, and that Father's accusations regarding her frequent "moves, and her alleged alcohol abuse are, at best, exaggerations and, at worst, falsehoods which show his inappropriate need to criticize Mother about her parenting." (Appellant's Br. p. 47). Mother's argument, however, is an invitation to reweigh the evidence and judge the credibility of the witnesses, which we cannot do. *See Haley*, 771 N.E.2d at 747. The trial court saw Mother and Father as witnesses, observed their demeanor, and scrutinized their testimony as it came from the witness stand. As in *Kirk*, we are "in a poor position to look at a cold transcript of the record, and conclude that the trial

judge, who saw the witnesses, observed their demeanor, and scrutinized their testimony as it came from the witness stand, did not properly understand the significance of the evidence, or that he should have found its preponderance or the inferences therefrom to be different from what he did." *Kirk*, 770 N.E.2d at 307. Based upon all of the evidence, we cannot say that the trial court abused its discretion by finding that a modification was in the Child's best interests. Accordingly, we conclude that the trial court did not abuse its discretion by granting Father's motion to modify custody.

## CONCLUSION

[56] Based on the foregoing, we conclude that the trial court did not abuse its discretion (1) in denying Mother's motion for continuance, (2) in admitting Father's exhibits, (3) in admitting certain evidence, and (4) in awarding Father sole legal and primary custody of the Child.

[57] Affirmed.

[58] Altice, J. concurs

[59] Brown, J. concurs in result with separate opinion

# IN THE
# COURT OF APPEALS OF INDIANA

In Re: The Marriage of:

Christine Toney,

*Appellant-Petitioner*,

v.

Edward Thomas,

*Appellee-Respondent.*

Court of Appeals Cause No.
06A05-1503-DR-121

**Brown, Judge, concurs in result with separate opinion.**

[60] I agree with the majority that the trial court did not abuse its discretion in granting Father's motion to modify custody. I write separately regarding certain testimony of M.W. and E.T.

[61] With respect to M.W.'s testimony, M.W. testified that M.T. called the Child racially derogatory terms, Father's counsel asked M.W. what names Mother had told her the Child was called by M.T., and M.W. answered "[h]e called her

a mutt and used the N word also." Transcript at 138. The majority finds that Mother's counsel failed to lodge an objection and thus that Mother has waived her argument regarding this testimony by M.W. Waiver notwithstanding, a statement is not hearsay if it is a statement by a party-opponent. Ind. Evidence Rule 801(d)(2) (providing "a statement is not hearsay if . . . [t]he statement is offered against an opposing party and . . . was made by the party in an individual . . . capacity . . ."). The statements here attributable to Mother constitute statements of a party opponent. *See Hughes v. State*, 508 N.E.2d 1289, 1298 (Ind. Ct. App. 1987) (noting that the alleged hearsay was offered by Patricia Taylor, who testified that Hughes told her that Hughes's doctor had threatened to file child abuse charges against Hughes, and holding that Taylor's statement, attributed to Hughes, was not inadmissible as hearsay), *reh'g denied*, *trans. denied*; *see also Irmscher Suppliers, Inc. v. Schuler*, 909 N.E.2d 1040, 1046 (Ind. Ct. App. 2009) (finding that statements in letters reporting a company employee's conclusion that windows were defective were admissible against the company under Ind. Evidence Rule 801(d)(2)).

[62] With respect to the testimony of E.T. regarding the incident at Starbucks, E.T. testified that Mother referred to her as a "fat cow" and said she was not welcome in her car and then specifically testified that the Child "heard that" and that "any time we had a situation like that, [the Child] would bring it up the next time she saw me and ask if [] I was okay and be very concerned about, um, the situation." Transcript at 157. In response to Mother's argument that this evidence is highly prejudicial as it shows the Child heard disagreements

between Mother, Father, and E.T., the majority finds that "the statement was not being offered to prove that the Child heard the argument between Mother, Father and E.T., but rather to establish the nature of E.T.'s interactions with Mother." Slip. op. at 17. My reading of E.T.'s testimony about the Child's statements to her is that it was offered to show that the Child heard and was affected by Mother's comment about E.T. Moreover, the testimony was elicited by Father at a custody modification hearing, and the court would consider the impact on the Child of placement with either parent. E.T.'s testimony about the Child's statements were offered to show the effect on the Child and not to show the relationship or interaction between E.T. and Mother. Nevertheless, even if E.T.'s testimony regarding the Child's out-of-court statements were prejudicial to an extent and were admitted in error, any such error was harmless because substantial independent evidence admitted at the hearing supports the court's determination on Father's motion to modify custody.

[63] I thus concur in the result that the trial court did not abuse its discretion in granting Father's motion to modify custody.