

IN THE

# Court of Appeals of Indiana

Kan Shao,

*Appellant-Respondent*

v.

Yan Li,

*Appellee-Petitioner*



FILED

Feb 02 2026, 8:36 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

---

February 2, 2026

Court of Appeals Case No.
25A-DC-1554

Appeal from the Monroe Circuit Court

The Honorable Emily A. Salzmann, Judge

Trial Court Cause No.
53C08-1906-DC-233

---

**Opinion by Judge Kenworthy**
Chief Judge Tavitas and Judge Bailey concur.

**Kenworthy, Judge.**

## Case Summary

During the marriage of Kan Shao ("Father") and Yan Li ("Mother"), they had two children: E.S. and M.S. ("Children"). When Father and Mother divorced in 2019, they agreed to share joint legal and physical custody of Children. In 2025, at Mother's request, the trial court modified custody, granting sole legal and physical custody of Children to Mother. Father raises several issues on appeal, which we restate and consolidate as: (1) Did the trial court erroneously rely on the guardian *ad litem* report?; and (2) Did the trial court abuse its discretion by modifying custody? We affirm.

## Facts and Procedural History

Father and Mother married in their native China in 2007. They both attended universities in the United States, where the two settled permanently. In 2011, the couple welcomed E.S., followed by M.S. in 2013. Both Children were born in the United States. The family ultimately moved to Bloomington, Indiana, where Father was hired to teach as a university professor. During the marriage, Father traveled out-of-state often for work. He similarly traveled to China for employment reasons and to visit family. Mother was the primary caregiver of Children. She stayed home for several years to raise Children before accepting employment as a regulatory affairs director for a company in its Bloomington office.

[3] In June 2019, Mother filed a verified petition for dissolution of marriage. In November, the trial court issued a dissolution decree incorporating the parties' settlement agreement. In the agreement, Father and Mother stipulated to, among other things, joint legal and physical custody of Children. The parties also agreed to a 5-2-2-5 parenting time schedule, which they later changed to a week-on, week-off arrangement. Moving forward, the parties communicated exclusively over email.

[4] Father's travel for employment and personal reasons continued after the divorce. His travels increased with the lifting of COVID-19 restrictions after 2020. In the subsequent years, Father attended conventions and conferences throughout the year. He received a grant which required him to attend workshops and training outside Indiana. Each time Father missed parenting time due to his travel, he would demand to exercise make-up time as soon as possible after he returned to Bloomington. In 2024, the university granted Father a sabbatical during which he intended to conduct work in China. In that year alone, Father requested changes to the parenting time schedule for approximately forty percent of the year. *Tr. Vol.* at 43; *see Ex. Vol. 1* at 51–75.

[5] Father made decisions regarding Children without consideration of Mother's opinion. He began the process of enrolling E.S. at a private school in northern Indiana without consulting Mother. He registered M.S. at a middle school closest to him before Mother had the opportunity to consider all available options. On a trip to China with Children, Father took E.S. to see a "growth doctor" because he had concerns about her height. *Tr. Vol.* at 89, 118–19.

Father obtained Chinese government identification documents for Children without Mother's consent. Father and Mother were unable to agree regarding Children's dental care because he refused to consent to the treatment.

[6] Mother filed a petition for modification of custody and parenting time in July 2024. The trial court appointed a guardian *ad litem* ("GAL") in November to represent the interests of Children. The court held a modification hearing on March 6, 2025. The GAL submitted a written report to the trial court before the hearing. Father, Mother, and the GAL all testified at the hearing.

[7] At the modification hearing, Father claimed the existing custody arrangement worked well, and when he had to travel, he and Mother agreed to make-up time "as quickly as possible." *Tr. Vol.* at 111. He testified the bulk of disagreements with Mother were regarding accommodations to parenting time during his sabbatical in 2024. Father blamed Mother for changing her mind about alterations to the parenting time schedule he believed had been resolved. He maintained once his sabbatical ended, things would "pretty much go back to normal," but, at the same time, he suggested: "I want to travel . . . but . . . not travel as much as . . . over [the] last year, or this year[.]" *Id.* at 113. Later in his testimony, Father clarified: "I acknowledge that I have some unexpected travel. I think as my reputation grow[s] in this field, I will probably [be] called on even more frequently in the future." *Id.* at 136. Father believed he was unfairly being asked to choose between his work and Children.

Father underscored he prioritized academic rigor in Children's lives as doing so was "in [his] blood." *Id.* at 127. According to Father, he chose not to "hide things from" Children, even if doing so impacted their view of Mother. *Id.* at 145. He recognized he pushed Children to excel academically, even though Children themselves were not as invested in his preferred activities. *See id.* at 127–31. In Father's estimation, there had been no substantial change in his encouragement of Children over the years. And if the court were to grant Mother's request to modify custody, Father worried she would "make unreasonable decisions." *Id.* at 135.

For her part, Mother explained she switched to communicating with Father over email to avoid triggering arguments with him. She described differences between Father's approach to raising Children and hers:

> I think the benefit of [Children] being exposed to different things and [making] a choice of their own, the benefit is more than [if] you . . . force them . . . to do something they don't want to do, . . . you probably gain something from there, but the benefit of them being independent, [if they] make a choice, dedicate to a choice, and then learn from that, that's more meaningful for the kids.

*Id.* at 32.

Mother asserted Father preferred to send Children "to things that he thinks they should be in." *Id.* Mother alleged Father involved Children in disputes between the two adults. She testified Father had M.S. inquire about her income to compare it to his and had M.S. ask her whether she signed a prenuptial agreement when she remarried. Mother emphasized she strove not to "put

extra stress" on Children by not discussing disputes between her and Father with them. *Id.* at 55.

[11] Mother testified to Father's attempts to bully her into agreeing to his schedule demands. For instance, Mother claimed Father threatened to prevent Children from traveling to her wedding unless she relented to all of his schedule alterations during the year of his sabbatical. She then shared how Father's constant need to adjust the parenting time schedule affected her and Children:

> [Y]ou cannot have . . . predictable things scheduled to plan your life, it's not only about worr[ying] about kids . . . there's no predictability, and the challeng[e] is [Father] demands make up time, there's a lot of communication . . . because he ask[s] for a specific make up time. And another thing would be, causing children to be confus[ed.] . . . [E.S.] messaged and [M.S.] was messaging me, probably messaging their Father in the middle of [the] day, where should we go after school[?]

*Id.* at 42–43.

[12] In addition to the parties' testimony, the trial court heard from GAL Kara Reagan. The GAL reiterated the recommendation she made in her report, that is, Mother should be awarded legal and physical custody of Children. The GAL expressed no concerns about the physical environment to which Children were exposed in either parties' household. But the GAL feared Father put Children in the middle of disputes with Mother. She had observed Father being critical of Mother in front of Children. The GAL recounted Father's "pattern of . . . not only making unilateral decisions . . . but also involving the kids in

that decision making process, and sort of making it an us against mom sort of situation." *Id.* at 89. The GAL believed Mother was "being sincere when she says that she genuinely tries to keep [Children] out" of disputes between her and Father. *Id.* at 87. According to the GAL, Father was "aggressive" in his "requests for scheduling accommodations" to parenting time. *Id.*

[13] Following the modification hearing, the trial court entered findings of fact and conclusions thereon modifying custody of Children. The court found, in relevant part:

> 39. Following the dissolution of marriage, Father has had to make various requests to modify the parenting time schedule each year due to needing to travel[.]
>
> * * *
>
> 43. In his testimony, Father confirmed that he anticipates traveling even more frequently in the future.
>
> * * *
>
> 47. Father's description of Parties' communication regarding parenting time is diametrically opposed to Mother's. . . . Father wholeheartedly believes that the first time the parties were unable to reach an agreement as to a parenting time schedule occurred in 2024.
>
> * * *

53.  Father believes that, while he may still need to request some parenting time modifications due to his normal travel, his schedule will return to normal when his sabbatical ends[.]  Thus, he stated that the week-on/week-off parenting time schedule could begin again.  However, Father clearly indicated that his travel will likely increase from the years prior to the sabbatical as his reputation grows in the field.  This seriously calls his above conclusion into question.

54.  Father attempted to show that his frequent travel was not a significant change, alleging that there has been no ongoing change in his amount of travel since the Decree.  Father frames his sabbatical as a brief issue.  When Father was asked about communication regarding the significant schedule changes in 2022 and 2023, he stated that there was previously "nothing so painful[."]  However, regardless of the outcome, the volume of communication, clear confusion by the Parties and the children, and the decline in the Parties' ability to communicate indicate[s] a clear issue.  Mother's decision to only communicate by email since the entry of the Decree in 2019 due to Father's aggressive behavior is highly indicative of the decline in the Parties' communication.  That aggressive behavior is supported by other sources.

55.  Father believes that the issue with parenting time modifications is that Mother does not request her modifications in a timely manner leading to him having to make last minute changes in his schedule to accommodate.  The Court does not find this credible.  The Court, based on the emails submitted, discerns that Mother does not respond *with agreement* quickly enough for Father's satisfaction.  Any reasonable delay in Mother's responses to parenting time changes up to one year away, while not having her schedule for the entire year, were entirely reasonable.

* * *

59. Communications between both parents in the past few years has been via emails only. In her testimony, Mother stated that in February 2024, she called Father for the first time since their divorce settlement was finalized in 2019 to discuss the parenting time changes Father proposed for the entirety of 2024. Prior to the call, as evidenced by Mother's Exhibit "33," there had already been twenty-five (25) email exchanges between them on the matter, but no resolution had been reached. Mother repeatedly stated that she lacked clarity regarding her 2024 schedule and was therefore unable to commit to all the proposed changes for the entirety of 2024 yet, while Father interpreted Mother's lack of objection as agreement to the changes. As soon as Mother disagreed with Father in the call, he yelled at her and hung up. When she attempted to call back multiple times to continue the conversation, he repeatedly hung up and threatened Mother "see you in court" whenever she did not agree with him.

60. Despite Mother's consistent efforts over the past few years, as shown in Mother's Exhibits "30" and "31[,]" to adjust her schedule to accommodate all of Father's voluntary travels and provide him with make-up time for every single travel, Father still declared that Mother is the "difficult" one when it came to his parenting time requests, because she wouldn't comply [with] all his requests.

* * *

62. In assessing the credibility of the Parties' description of their communication regarding parenting time, the Court can rely not only on the communications themselves, which support Mother's account both with regards to the content and the volume of the emails, but also Father's testimony at the hearing. That

testimony is a clear indication of the dynamic and disfunction [sic] between the Parties in their communication.

* * *

80. In her interview with [the] GAL and as reflected in the GAL report and in Mother's testimony, Mother stated that Father makes unilateral decisions. The Court finds this credible.

* * *

145. Mother noted in the hearing that, during the initial dissolution, she was criticized by Father as being too intense and focused on academics for the children. Mother deliberately took that feedback and has encouraged a more balanced lifestyle for the children.

146. Father's approach is to put the children on whatever conveyor he thinks the kids should be placed. Father took a different approach to extracurricular activities. For example, as indicated in the GAL report, both children reported, separately, that they are no longer interested in violin and do not want to play, but that Father continues to make them practice . . . . Father claims that if he becomes aware that his children are not enjoying a particular activity, he will not force them to continue. This is inconsistent with his behavior.

*Appellant's App. Vol. 2* at 15–19, 21, 30.

[14]    The trial court then concluded in part:

197. Both parents want the children to excel academically, in extracurriculars and professionally. Father put very little, if not

no emphasis on the children's emotional well-being during his testimony.

\* \* \*

199. Father blames . . . cultural differences for the conflict between the Parties in making decisions concerning the children. However, this discounts Father's disregard for Mother's position and opinions in making these decisions. Father has repeatedly shown that he will take steps to further academic and medical options that Mother is either unaware of or objects to, without her knowledge, simply because he believes she will not agree.

\* \* \*

201. The GAL report noted that "Father's frequent travel schedule is incompatible with shared physical custody. Both the parents and the children need to be able to rely on a consistent schedule so that they know what to expect and can plan accordingly, and they are not able to do so when adjustments to the regular schedule are needed with such frequency[."]

\* \* \*

214. Father claims that since he is not placing his children in danger he should not be "punished" for "having a different cultural belief" than Mother. However, Father's cultural beliefs are not the reasoning cited by the GAL for why she has recommended a reduction in Father's parenting time. Due to Father's travel, it is not feasible for the Parties to share joint physical custody. Father's future travel, while less than in 2024, is likely to increase as time goes on, not decrease.

\* \* \*

216. The essence of what this Court must find in order to reduce Father's parenting time is that it is in the children's best interests. That is the case here.

217. After considering the evidence presented and the required statutory factors, the Court finds that there has [been] a substantial and continuing change, and that it is in the minor children's best interest that custody should be modified. The court finds that it is appropriate that Mother be awarded primary physical custody subject to Father's parenting time according to the Indiana Parenting Time Guidelines with the midweek visit being an overnight to avoid the additional back and forth of a non-overnight visit.

\* \* \*

222. In the GAL's report and oral testimony at trial, the GAL has recommended that as a part of a final order of this Court that it is of [E.S.] and [M.S.'s] best interests that Mother have legal custody.

\* \* \*

225. After considering the evidence presented and the required statutory factors, the Court finds that there has been a substantial and continuing change, and it is in the best interests of the minor children that Mother receives the legal custody.

226. [A]ll communication issues referenced primarily for the purpose of analyzing physical custody are relevant to the issue of sole legal custody, as they are indicative of the Parties' ability to communicate and cooperate in advancing [Children's] welfare, or lack thereof.

*Id.* at 37–41.

## Standard of Review

"We review custody modifications for abuse of discretion with a preference for granting latitude and deference to our trial judges in family law matters." *In re K.I.*, 903 N.E.2d 453, 457 (Ind. 2009) (internal quotation omitted). Child custody determinations are "very fact-sensitive." *Steele-Giri v. Steele*, 51 N.E.3d 119, 125 (Ind. 2016). Trial courts are in the best position to evaluate the facts, determine witness credibility, comprehend the family dynamics, and "get a sense of the parents and their relationship with their children." *E.B.F. v. D.F.*, 93 N.E.3d 759, 762 (Ind. 2018) (quoting *MacLafferty v. MacLafferty*, 829 N.E.2d 938, 940 (Ind. 2005)). Appellate courts "are in a poor position to look at a cold transcript of the record, and conclude that the trial judge, who saw the witnesses, observed their demeanor, and scrutinized their testimony as it came from the witness stand, did not properly understand the significance of the evidence[.]" *Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002) (quoting *Brickley v. Brickley*, 210 N.E.2d 850, 852 (Ind. 1965)). "Appellate judges are not to reweigh the evidence nor reassess witness credibility, and the evidence should be viewed most favorably to the judgment." *Best v. Best*, 941 N.E.2d 499, 502 (Ind. 2011) (citations omitted).

The trial court entered findings of fact and conclusions thereon to support its judgment. We will "not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to

judge the credibility of the witnesses." Ind. Trial Rule 52(A). Where, as here, the trial court enters findings *sua sponte*, we review issues covered by the findings by determining first whether the evidence supports the findings and, if so, whether the findings support the judgment. *Steele-Giri*, 51 N.E.3d at 123. Findings are clearly erroneous if the record contains no facts or inferences supporting them. *State v. Int'l Bus. Machs. Corp.*, 51 N.E.3d 150, 158 (Ind. 2016). A judgment is clearly erroneous if it relies on an incorrect legal standard. *Id.* We apply a general judgment standard to issues upon which the trial court made no findings. *Steele-Giri*, 51 N.E.3d at 123–24; *see* T.R. 52(D). We will affirm a general judgment entered with findings if it can be sustained on any legal theory supported by the evidence. *Miller v. Lucas*, 264 N.E.3d 651, 655 (Ind. Ct. App. 2025) (citing *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997)).

## The trial court did not abuse its discretion by relying on the GAL report.

[17] As a threshold matter, Father argues the trial court committed reversible error because it relied on the GAL report in making its modification decision. More specifically, Father argues the trial court, "absent its own motion," should not have relied on the GAL report "when entering an order" because the report was not submitted into evidence as an exhibit nor was the court ever asked to take judicial notice of it. *Appellant's Br.* at 14.

[18] A GAL is an attorney, volunteer, or employee who represents and protects the best interests of a child and provides the child with services a court requests.

Ind. Code § 31-9-2-50(a) (2018). Indiana Code Section 31-17-2-12(a)(5) permits a trial court to order an investigation and report in custody proceedings, and a GAL may prepare the report. "In preparing a report concerning a child, the [GAL] may consult any person who may have information about the child and the child's potential custodian arrangements." I.C. § 31-17-2-12(b). "The court shall mail the [GAL's] report to counsel and to any party not represented by counsel at least ten (10) days before the hearing." I.C. § 31-17-2-12(c). The report "(1) may be received in evidence at the hearing; and (2) may not be excluded on the grounds that the report is hearsay or otherwise incompetent." I.C. § 31-17-2-12(b).

[19] Here, Father never alerted the trial court of any potential issues regarding the admissibility of the GAL report. Both parties referenced the contents of the GAL report throughout the modification hearing. At no point did Father object during the GAL's or Mother's testimony on the grounds the report or its content was inadmissible or otherwise not properly before the trial court. Father has therefore waived this claim on appeal. *Cf. In re Guardianship of Hickman*, 805 N.E.2d 808, 822 (Ind. Ct. App. 2004) ("The failure to make a contemporaneous objection to the admission of evidence at trial, so as to provide the trial court an opportunity to make a final ruling on the matter in the context in which the evidence is introduced, results in waiver of the error on appeal.") (citing *Brown v. State*, 783 N.E.2d 1121, 1125 (Ind. 2003)), *trans. denied*. Waiver notwithstanding, the facts demonstrate Father was not unduly prejudiced by the court's consideration of the GAL report.

[20]     In *Bowman v. Bowman*, a panel of this Court considered a challenge to the admission of a GAL report fourteen days after the custody hearing in alleged violation of mother's due process rights. 686 N.E.2d 921, 923–24 (Ind. Ct. App. 1997). Although the GAL was present at the hearing, she was not asked to testify. *Id.* at 924. At the end of the hearing, the GAL made a statement underscoring the conclusions found in her report. *Id.* The panel affirmed the trial court's later admission decision in part because (1) mother had the "opportunity to cross-examine the person who prepared the report"; (2) the parties received the report ten days before the hearing, "as required by statute"; (3) both parties "referred to information in the report" during the hearing; and (4) no party objected to the GAL's statement during the hearing. *Id.* at 925.

[21]     In this case, the trial court appointed Kara Reagan as GAL to represent the interests of Children. She filed her report with the court on February 24, 2025, ten days before the modification hearing on March 6. To prepare her report, the GAL contacted Father and Mother; Mother's friends; Mother's new husband; Mother's parents; Children; Children's teachers; and Children's piano instructor. The GAL testified during the modification hearing about the content of the report and the evidence on which it relied. Both parties referenced information found in the report throughout the hearing and later in their proposed orders to the court.

[22]     Although the GAL report was not admitted into evidence, the facts in this case otherwise parallel those in *Bowman*. Father had ample opportunity to cross-examine the GAL about her report and the evidence on which it relied. Father

and Mother referenced information included in the report during the hearing and in their proposed orders. Based on these circumstances, the trial court did not abuse its discretion by relying on the GAL report in making its modification order.[1]

## The trial court did not abuse its discretion by modifying custody.

[23] With respect to the trial court's findings, Father first argues the court committed error by relying on facts "predating the last court order on custody[.]" *Appellant's Br.* at 17 (citing *In re Marriage of Simmons*, 487 N.E.2d 450, 453–54 (Ind. Ct. App. 1985), *trans. denied*. Generally, because modification requires a substantial change in one or more of the statutory factors since the last order, trial courts "shall not hear evidence on a matter occurring before the last custody proceeding between the parties[.]" I.C. § 31-17-2-21(c) (1999). In this matter, Father takes issue, among other things, with the trial court finding he previously engaged in abusive behavior during the marriage; he exerted financial control over Mother during the marriage; Mother was the primary caregiver during the marriage; and Father deprived Mother of childhood photos of Children.

---

[1] Although we discern no abuse of discretion in the trial court relying on the GAL report based on the record before us, we take this opportunity to remind parties and attorneys the best practice is to move to admit the report into evidence as an exhibit.

[24] In *Dwyer v. Wynkoop*, a panel of this Court considered a challenge to a modification order in which the trial court relied on evidence of changed circumstances submitted to the court for the first time at the modification hearing. 684 N.E.2d 245, 247–48 (Ind. Ct. App. 1997), *trans. denied*. In affirming the trial court, the panel stressed although a modification petition "is not a vehicle to relitigate the initial custody determination[,]" information regarding a child's current circumstances previously unknown to the court is not "relitigation . . . especially when custody was stipulated to by the parties in a summary dissolution proceeding[.]" *Id.* at 249; *see also Bettencourt v. Ford*, 822 N.E.2d 989, 999 n.4 (Ind. Ct. App. 2005) (declining to reverse trial court's modification order when, even without the challenged testimony, the evidence showed a "substantial change in one of the statutory factors since the original custody order").

[25] Here, Father and Mother stipulated to joint legal and physical custody of Children following the dissolution of their marriage in 2019. Because Children's custody was initially determined "without further inquiry by the trial court[,]" nothing prohibited the court below from considering all the available evidence at the time of the modification hearing. *Cf. Dwyer*, 684 N.E.2d at 249. Such consideration is particularly appropriate when the evidence relates to a pattern of continuing behavior that poses a threat to a child's ongoing emotional or physical wellbeing. Indeed, a trial court may not modify a child custody order unless the modification is in the child's best interests. I.C. § 31-17-2-21(a)(1). The trial court did not err in relying on the challenged evidence.

Father next argues the evidence does not support the trial court's findings, nor do the findings support the court's conclusions that (1) there was a substantial change in one or more of the relevant factors to support custody modification, and (2) custody modification was in Children's best interest.

Modification of child custody is governed by statute:

> (a) The court may not modify a child custody order unless:
>
>> (1) the modification is in the best interests of the child; and
>>
>> (2) there is a substantial change in one (1) or more of the factors that the court may consider under section 8 . . . of this chapter.
>
> (b) In making its determination, the court shall consider the factors listed under section 8 of this chapter.

I.C. § 31-17-2-21. Under Section 8, the court "shall consider all relevant factors," including:

> (1) The age and sex of the child.
>
> (2) The wishes of the child's parent or parents.
>
> (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
>
> (4) The interaction and interrelationship of the child with:
>
>> (A) the child's parent or parents;

(B) the child's sibling; and

(C) any other person who may significantly affect the child's best interests.

(5) The child's adjustment to the child's:

(A) home;

(B) school; and

(C) community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

I.C. § 31-17-2-8 (2017) ("Section 8 factors"). Section 8 factors are to be considered in making changes to physical custody. *See Julie C. v. Andrew C.*, 924 N.E.2d 1249, 1259 (Ind. Ct. App. 2010).

[28] When considering modification from joint legal custody to sole legal custody, the trial court "must determine whether there has been a substantial change in one or more of the factors listed in Indiana Code Section 31-17-2-15, in addition to considering any substantial change to the Section 8 factors, as is typically necessary for physical custody modifications." *Milcherska v. Hoerstman*, 56 N.E.3d 634, 641 (Ind. Ct. App. 2016). The factors include those applicable when making an initial award of joint custody:

(1) the fitness and suitability of each of the persons awarded joint custody;

(2) whether the persons awarded joint custody are willing and able to communicate and cooperate in advancing the child's welfare;

(3) the wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age;

(4) whether the child has established a close and beneficial relationship with both of the persons awarded joint custody;

(5) whether the persons awarded joint custody:

(A) live in close proximity to each other; and

(B) plan to continue to do so; and

(6) the nature of the physical and emotional environment in the home of each of the persons awarded joint custody.

I.C. § 31-17-2-15 ("Section 15 factors"). And in evaluating an arrangement of legal custody, "the court shall consider it a matter of primary, but not determinative, importance that the persons awarded joint custody have agreed to an award of joint legal custody." I.C. § 31-17-2-15.

[29] Father claims he and Mother "reached agreements on each and every issue prior to [the modification] hearing," allowing the parties "to advance their children's welfare and resolve issues pertaining to them for approximately five

years." *Appellant's Br.* at 20. According to Father, the trial court failed to "offer any legitimate, evidence-based finding or conclusion that there had been a substantial and continuing change as it relates to legal custody[.]" *Id.* He makes similar arguments regarding the court's conclusion on physical custody of Children. *See id.* at 30–33.

[30] The trial court's order demonstrates it considered the relevant statutory factors. First, the evidence shows a breakdown in communication between Father and Mother. *See* I.C. § 31-17-2-15(2). Mother communicates with Father only via email to avoid verbal disputes. Even so, the email communication between the two parents demonstrates ongoing discord between them. Much of the disagreement stems from Father's continued demands to alter the parenting time schedule and to be provided with make-up time as soon as possible. His professional commitments took him outside Indiana and the United States, which required numerous parenting time accommodations. His sabbatical from the university led to extensive alterations to the parenting time schedule in 2024 alone. Father's need for accommodations created an unpredictable environment resulting in stress for Children and all parties involved. *See* I.C. § 31-17-2-8(4)(A).

[31] The trial court found Father's description of communication issues diametrically opposed to Mother's. After examining the email communication between the parties and evaluating the testimony, the court found Father's behavior as indicative of the parties' inability to communicate with each other. The trial court concluded Mother's responses to parenting time changes were

reasonable, as she simply did not respond or assent quickly enough for Father's satisfaction. Moreover, the court found Father's prediction of a "return to normal" was not credible, as Father himself admitted his travel will likely increase as his reputation grows. *Appellant's App. Vol. 2* at 17.

[32] Second, the trial court found Father and Mother held divergent views about how to promote the welfare of Children. *See* I.C. § 31-17-2-15(2); *see also J.W. v. M.W.*, 77 N.E.3d 1274, 1278 (Ind. Ct. App. 2017) (recognizing "whether the parents are willing and able to cooperate in advancing the child's welfare . . . is of particular importance in making legal custody determinations") (citation omitted). At the modification hearing, Father described he wanted Children to attend the "most prestigious universities" even if at times it meant pushing Children to do things they may not wish to do. *Tr. Vol.* at 124, 128–31. He discussed how prioritizing education was "in [his] blood." *Id.* at 127. Father's approach differed significantly from Mother's, as she believed it was most beneficial for Children to "be exposed to different things and make a choice of their own[.]" *Id.* at 32. The GAL testified Children were "most comfortable and [felt] most at home at mom's house." *Id.* 92. After scrutinizing the testimony of the parties and the evidence presented, the trial court determined "Father's approach [was] to put the children on whatever conveyor he thinks the kids should be placed." *Appellant's App. Vol. 2* at 30. Based on Father's testimony, the court concluded he "did not appear to put much, if any, weight on the emotional care of the children" and found Mother's approach fostered a "more balanced lifestyle" for them. *Id.*; *see also* I.C. § 31-17-2-15(6).

[33]   Third, the evidence before the trial court demonstrates both parties have made unilateral decisions regarding Children, but especially in Father's case. *See* I.C. § 31-17-2-8(4)(A); *see also McDaniel v. McDaniel*, 150 N.E.3d 282, 289 (Ind. Ct. App. 2020) (clarifying the trial court need only find there has been a substantial change in one of the Section 8 factors to support a custody modification), *trans denied*. Father began the process of enrolling E.S. at a private boarding school in northern Indiana. E.S. had expressed interest in the school after visiting the campus with Father. Over Mother's objection, Father had E.S. study for and twice take an admissions test for the school. Father enrolled M.S. at a middle school closer to his house before Mother had the chance to review information packets and brochures of all the available options. Father refused to consent to dental treatment for Children. On at least one occasion, Father's refusal led to delayed treatment of a cavity from which M.S. experienced toothache and a gum infection. *See* I.C. § 31-17-2-15(2). During a visit to China, over Mother's disagreement, Father took E.S. to see a "growth doctor" where she underwent an x-ray examination of her hand. *Tr. Vol.* at 151. Father also obtained Chinese government identification documents for Children without consulting Mother.

[34]   Fourth, Father has a history of putting Children in the middle of disputes between himself and Mother. *See* I.C. § 31-17-2-8(4)(A); I.C. § 31-17-2-15(6). Father had M.S. inquire about Mother's income and whether she signed a prenuptial agreement before marrying her new husband. Other times Father used Children to cajole Mother into agreeing to parenting time changes. *See Tr.*

*Vol.* at 33, 44. Father's "philosophy" is to not hide things from Children. *Id.* at 145. The GAL testified to witnessing Father being critical of Mother in front of Children. The trial court found, in spite of Mother's efforts to shield Children from parental disputes, "they have still been exposed to conflict at an inappropriate level." *Appellant's App. Vol. 2* at 32.

[35] Taken together, the trial court's findings and conclusions indicate it considered the factors in Section 8 and Section 15 when entering its custody order. Since the parties' initial stipulation, the findings demonstrate a substantial change in their ability to communicate and cooperate to advance Children's welfare. Father's need for make-up time and alterations to the parenting schedule resulted in instability and stress for all involved. He acted unilaterally without consulting Mother regarding Children, and both parents diverged on how to promote Children's academic and personal growth. The trial court concluded Children's best interests were no longer served by joint custody, and based on these circumstances, the court did not abuse its discretion by awarding legal and physical custody to Mother.

## Conclusion

[36] Applying this Court's highly deferential standard of review in family matters, we affirm the trial court's decision to modify custody and grant sole legal and physical custody to Mother.

[37] Affirmed.

Tavitas, C.J., and Bailey, J., concur.

ATTORNEY FOR APPELLANT

Lauren E. Harpold
Ruppert & Schaefer, P.C.
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Zachary J. Stock
Zachary J. Stock, Attorney at Law, P.C.
Carmel, Indiana